IN THE U.S. DISTRICT COURT

MIDDLE DISTRICT OF ALABAMA RECEIVED

Northern Division

| | |
|---|---|
| J.P., | 2019 SEP -3 P 3: 48 |
| as parent and next friend of | |
| A.W., a minor, | DEBRA P. HACKETT, CLK Jury Trial Demanded |
| | U.S. DISTRICT COURT |
| | MIDDLE DISTRICT ALA |
| Plaintiff, | |
| | 2:19-cv-636. |
| v. | |
| | |
| Elmore County Board of Education, | |
| | |
| Defendant. | |

## COMPLAINT

### Parties

1.      Plaintiff J.P. is an Alabama citizen over the age of 19 and is the mother, custodial parent, and next friend of A.W., a minor.

2.      Plaintiff A.W. is a minor, who, at all times relative to the incidents forming the basis of this lawsuit, was a student in the Elmore County school district.

3.      Defendant Elmore County Board of Education ("ECBOE") is a state governmental entity that bears exclusive responsibility for the operation, management, and control of the Elmore County school district ("the District").

## **Venue , Filing Prerequisites, and Jurisdiction**

4.     Pursuant to 28 U.S.C. § 1391(b), venue is appropriate in the U.S. District Court for the Middle District of Alabama because the defendant resides in this district and it is the district in which the acts, omissions, and events occurred that form the basis of this lawsuit.

5.     Pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (4), this Court possesses original jurisdiction over the plaintiff's claims under the Americans With Disabilities Act ("ADA") and the Rehabilitation Act of 1973 ("§ 504").

6.     As a prerequisite to A.W.'s ADA and § 504 claims in this lawsuit, J.P., on A.W.'s behalf, filed two special-education due-process complaints with the Alabama Department of Education.

7.     Those matters were styled A.*W. v. Elmore County Board of Education, Alabama Department of Education* (2017-149) and *A.W. v. Elmore County Board of Education, Alabama Department of Education* (2019-05).

8.     Both due-process complaints alleged that defendant ECBOE violated A.W.'s rights guaranteed by the ADA and § 504.[1]

9.     In the 2017 due-process case, the parties reached a settlement.

---

[1] Hearing officers who are appointed to preside over a student's special-education due process complaints do not possess jurisdiction over that student's ADA and § 504 claims.

10.     The parties memorialized that settlement with a signed agreement, which was entered as a final judgment in April 2018.

11.     The ECBOE did not appeal the April 2018 final judgment.

12.     In 2019, A.W.'s mother filed another due-process complaint, which alleged that the ECBOE breached the settlement reached in the 2017 due-process case and violated the express language of the 2018 settlement agreement and final judgment entered by the hearing officer.[2]

13.     The 2019 due-process complaint proceeded to a hearing.

14.     At the close of the evidence, the hearing officer ruled in favor of A.W. and entered judgment in A.W.'s favor.

15.     Again, the ECBOE did not appeal any part of this judgment.

## Part I:
## General Facts

16.     Through the Alabama Department of Education, the ECBOE received money from the United States Department of Education to ensure that schools in the Elmore County school district provide a free, appropriate public education to disabled children who attend schools in that system.

---

[2] As in the 2017 due-process complaint, the 2019 due-process complaint also alleged that the ECBOE violated A.W.'s rights guaranteed by the ADA and § 504.

17.     The Individuals With Disabilities Education Act (the "IDEA") is a United States law that makes funds available to states, such as Alabama, for special education on the condition that the recipient's public-school system provide a free, appropriate public education for all handicapped children.

18.     To the extent possible, Alabama public schools, including schools that fall under the control of the ECBOE, must "mainstream disabled children into regular education settings." 20 U.S.C. §1412(5)(B).

19.     The primary mechanism used by the ECBOE to make sure that handicapped children who attend schools under its control actually receive a free, appropriate public education is the creation of, implementation of, and adherence to a detailed, individualized instruction plan known as an Individualized Education Program ("IEP").

20.     The ECBOE's superintendent and employees are charged with the actual creation of, implementation of, and adherence to a student's IEP and, thus, act under color of law when they carry out these responsibilities.

21.     The Rehabilitation Act of 1973, § 504, prohibits any program or activity that receives federal funds from excluding from the participation in, denying the benefits of, or discriminating against any disabled individual based on his disability.

22.     Likewise, the Americans with Disabilities Act (the "ADA") prohibits any

public entity from excluding from participation in or denying the benefits of its

services, programs, activities, or discriminating against a disabled individual based

on his disability.

### Part II:
### A.W.'s Disabilities and His Attendance and Progress in the Elmore County School District Up to December 2017

23.     A.W. is a 12-year-old boy.

24.     Since birth, A.W. has been profoundly hearing impaired.

25.     Despite his promotion from elementary school to middle school, A.W.

never acquired, and, does not now possess, either written or spoke language skills.

26.     Recent testing showed that A.W.'s intellectual level is that of a child

age 1 to 3 years.

27.     A.W. is unable to read or write.

28.     A.W. does not know American Sign Language.

29.     Since A.W.'s enrollment in the Elmore County school district, his

behavior, at times, has been reasonably good, but, at times, also very aggressive,

violent, and sometimes uncontrollable.

30.     At nearly all times before December 2017, A.W.'s education occurred

at ICARE, which is the District's alternative school.

31.     In 2009, the District's IEPs for A.W. noted that he had a tendency for aggressive behavior.

32.     The District's 2014 IEPs for A.W. noted that he struck, pushed, or shoved teachers and staff; screamed at staff, teachers, and other students; struck other students; punched and spit on his bus driver; and destroyed school property.

33.     A.W.'s 2014 IEPs also noted that he was under the care of a psychiatrist but that he continued to throw tantrums, that he became easily frustrated with assignments, and that he was emotionally impaired.

34.     In 2014, A.W.'s test results revealed clinical aggression, that his non-verbal intelligence was very poor, and that his ability to appropriately adapt his behavior to a given situation was "extremely low."

35.     A.W. exhibited similar behaviors in 2015, 2016, and in the fall of 2017.

36.     Despite the fact that A.W. was promoted to a new grade level each year, his intellectual level stagnated in the 1 to 3-year old range.

**Part III:**
**A.W.'s December 2017 Amended IEP, Which Changed His LRE to Homebound,**
**A.W.'s Subsequent Due-Process Claim,**
**and the 2018 Settlement and Judgment**

37.     In December 2017, A.W.'s IEP team decided to change A.W.'s least restrictive environment to homebound.

38.    A.W.'s IEP team based its decision on A.W.'s numerous violent outbursts and his out-of-control behavior, which included overturning furniture, screaming, and property destruction.

39.    Under the District's version of homebound, A.W. would be educated at his actual home and would not be allowed to attend a District facility.

40.    A.W.'s mother would not agree because, as single mother, she could not both keep her job as a Montgomery hotel manager and remain at home each day so that A.W. could be educated there.

41.    When A.W.'s IEP team refused to reconsider its decision, A.W.'s mother filed a due-process claim against the District, which was styled *J.P. on behalf of A.W. v. Elmore County Board of Education, 2017-149*, Alabama Department of Education.

42.    In April 2018, the case proceeded to a hearing.

43.    During the hearing, a witness named Kameron Carden testified.

44.    Ms. Carden testified that as an employee of the Alabama Institute for Deaf and Blind ("AIDB"), she had administered certain tests to A.W. and had performed evaluations on him.

45.    Critically, Ms. Carden explained that in order for A.W. to receive an appropriate education from the ECBOE, he would need [i] "explicit instruction in a

manual communication system," [ii] "time with the speech pathologist to develop vocabulary skills rather than articulation skills," and specific instruction from "a teacher of the deaf or a speech pathologist who knows sign language."

46.     After a one-day hearing, the case settled, and the hearing officer entered the parties' written settlement agreement as a final judgment. *See* Exhibit A.

47.     The April 2018 judgment specified several critical tasks, or items, that required the District's compliance:

    a.     First, if the District decided that A.W.'s least restrictive environment was homebound, then the District was required to provide A.W.'s homebound services at a school or school facility within the District's jurisdiction.

    b.     Second, if the District conducted an IEP meeting for A.W., the District was required to invite to the IEP meeting an "outreach professional" from the AIDB.

    c.     Third, if the District conducted an IEP meeting for A.W., the District was also required to invite to the meeting a board-certified behavioral analyst ("BCBA"), who was to be to paid by the District.

d.      Fourth, the judgment required the District to provide extended school

year services (also called "ESY," which are services offered to the

student over the summer break) and transportation to A.W. for the

summer of 2018.

e.      Fifth, the judgment required the District to administer to A.W. an

intellectual evaluation, a math achievement test, and a reading

achievement test.

f.      Sixth, the judgment required the District to [i] hire a BCBA from The

Learning Tree to develop an updated functional behavioral

assessment and behavior intervention plan for A.W. and to [ii]

"consult with the BCBA for the remainder of the 2017-2018 school

year in providing behavioral services to A.W."

## Part IV:
## 2018 Post-Judgment Events
### and the Close of the 2017-2018 School Year

48.     Unfortunately for A.W., the District did not comply with the judgment.

49.     In fact, soon after the April 2018 settlement and judgment, A.W.'s IEP

team met on May 8.

50.     However, no one from the District invited an outreach professional

from the AIDB or a BCBA.

51.    At the May 8 meeting, the IEP team concluded that A.W.'s least restrictive environment would best be met by placing him at the District's alternative school called ICARE.

52.    Another IEP meeting occurred a week later on May 14.

53.    Again, though, no one from the District invited an outreach professional from the AIDB or a BCBA.

54.    At that meeting, A.W.'s IEP team elected to change A.W.'s placement from ICARE to Millbrook Middle School.

55.    When school recessed for the summer of 2018, A.W. did not receive ESY services, even though the April 2018 judgment required the District to provide ESY services to A.W.

## Part V:
### The 2018-2019 School Year, the August 27 Amended IEP, and the 2019 Due-Process Claim

56.    When the 2018-2019 school year started in August 2018, A.W. was a sixth grader.

57.    A.W. began attending sixth grade Millbrook Middle School.

58.    Immediately after school started, it became apparent to A.W.'s special-education teacher that A.W. was unable to complete simple assignments or tasks. According to A.W.'s special-education teacher:

a.   A.W.'s intellectual function was at the "pre-school level."

b.   A.W. could use his fingers to represent the numbers 1 to 10, but, because he did not know American Sign Language ("ASL"), he could not understand a complex ASL sentence such as, "Do you understand the assignment I have given you?"

c.   The limit of A.W.'s communication skills permitted him to say things like, "I am hungry" or "I need to go to the toilet" or "Get out of my face."

d.   Although A.W. had an ASL interpreter with him daily, he did not know ASL and could neither understand his interpreter's signs nor could he respond in ASL.

e.   At most, A.W. understood one-, two-, or three-word phrases, such as "Point to the cat" and "Point to the dog."

f.   A.W. became easily frustrated and angered because of his inability to understand or complete his assignments.

59.   On August 16, A.W. became agitated when he got off the school bus and remained so at other times that day, and his behavior soon turned disruptive.

60.     When he arrived in class that day, he tried to leave, and, when he was prevented from doing so, he hit the classroom windows, threw objects onto the floor, and spit on, bit, shoved, kicked, and swung at staff.

61.     A.W.'s behavior required the staff to restrain him, but A.W. was released from restraint and eventually calmed himself.

62.     On August 20, A.W.'s IEP team met and discussed A.W.'s behavior from August 16, possible interventions, and decided that A.W. would remain at Millbrook Middle School.

63.     The IEP team's notes from the August 20 IEP team meeting say, "Needs a BC/BA completed...more behavior intervention required."

64.     However, no one from the IEP team invited an AIDB outreach professional or a BCBA to the August 20 IEP team meeting, which is what the 2018 judgment required.

65.     On August 21, A.W.'s behavior again turned disruptive and abusive.

66.     That day, he banged his fists on this table; struck his teachers; knocked the materials off the special-education teacher's desk; threw a metal chair; and smashed a computer screen.

67.    On August 24, a BCBA named Morgan Marshall, who was employed by The Learning Tree, visited Millbrook Middle School to begin her functional behavioral assessment of A.W.

68.    Ms. Marshall observed A.W. in the classroom setting and also spoke to his teachers and support staff.

69.    In her consultation report from August 24, Ms. Marshall stated, "I asked [the ASL interpreter] more about how she is teaching sign language and his progress since the hearing impairment has hindered his ability to communicate, which may motivate the behavior."

70.    Ms. Marshall concluded that she needed "to conduct additional observation(s) to continue the functional behavior assessment process."

71.    Prior to departure from Millbrook Middle School that day, Ms. Marshall provided a form called the *Questions About Behavior Function (QABF)* to A.W.'s special-education teacher, A.W.'s interpreter, and A.W.'s paraprofessional aide.

72.    Between August 22 and August 27, A.W.'s behavior was appropriate.

73.    On August 27, A.W.'s IEP team met to discuss A.W.'s least restrictive environment.

74.     However, no one from the IEP team invited an AIDB outreach professional or a BCBA to the August 27 IEP team meeting, which is what the 2018 judgment required.

75.     That day, the IEP team discussed whether to remove A.W. from Millbrook Middle School and place him at ICARE or in homebound.

76.     A.W.'s mother objected to any decision that placed A.W. at home for any part of the school day because she worked full-time as a hotel manager in Montgomery and she could not both keep her job and remain at home each day so that A.W. could be educated there.

77.     A.W.'s mother also explained that she had no other relatives within Elmore County with whom she could leave A.W. each day.

78.     Nevertheless, the IEP team changed A.W.'s least restrictive environment to homebound and decided that he would be allowed to attend Millbrook Middle School for one hour a day until he could control his behavior.

79.     At the August 27 meeting, A.W.'s IEP team decided that when A.W. could control his behavior, then he would transition from homebound back to Millbrook Middle School.

80.    The IEP team made this decision without input or advice from the BCBA, the AIDB outreach professional, a psychiatrist, a psychologist, the District's behavioral specialist Jack Meyer, an attorney, or any other professional.

81.    Regarding A.W.'s behavior, A.W.'s special-education teacher felt that at least some of A.W.'s conduct was a manifestation of his disabilities but that the District chose not to do a manifestation determination review.

82.    Similarly, before deciding to change A.W.'s least restrictive environment to homebound, the IEP failed to consult with the BCBA and never actually provided the QABF forms to the BCBA until many months later.

83.    A.W.'s mother did not consent to the IEP team's decision.

84.    A.W.'s mother repeatedly explained that her work schedule and family circumstances prevented her from being able to agree with the IEP team's decision to remove A.W. from school and educate him daily at his home.

85.    The IEP team persisted and asked A.W.'s mother for an address where A.W. could be dropped off after spending an hour each day at school.

86.    A.W.'s mother provided an address to a District assistant principal at Millbrook Middle School, but the District claimed that it never received the address.

87.   The District's special-education director agreed that it would be unreasonable for A.W. to be left at home alone because he clearly needed supervision.

88.   Eventually, in late August, A.W. stopped attending school because the IEP team changed his least restrictive environment to homebound, which permitted him to attend Millbrook Middle School for only 1 hour a day, and A.W.'s mother had no place within Elmore County for A.W. to remain during the day while she was at work.

89.   A.W. remained out of school for 11 months.

90.   A.W.'s mother then filed a due-process claim against the District styled *A.W. v. Elmore County Board of Education, Alabama Department of Education* (2019-05).

91.   During the pendency of the due-process case, the District reported to the Elmore County District Attorney's office that A.W. was not attending school and that his mother, J.P., was in violation of truancy laws.

92.   The District took this action even though, in violation of the April 2018 settlement agreement and judgment, the District had decided that A.W. could not attend school and the District ignored the fact that A.W.'s mother had actually provided an address at which A.W. could be dropped off daily.

93.     After discovery, the case proceeded to a hearing over several days.

94.     In May 2019, the hearing officer ruled in favor of A.W. and found that "the District breached the *Settlement Agreement* and violated the Hearing Officer's accompanying Order of April 5, 2018. *See* Exhibit B.

95.     The hearing officer found that that "District has denied FAPE to [A.W.]." *Id.*

96.     The hearing officer also required the District to immediately comply with the April 2018 judgment and with the specific requirements of his May 2019 order and judgment.

97.     The hearing officer also made certain factual findings, which were, among others:

a.     The District was well aware of A.W.'s behaviors long before the 2017 due-process claim was filed.

b.     The evidence showed that, according to the IEP team, the "pro" of changing A.W.'s least restrictive environment to homebound was that he would pose "no danger to others."

c.     The District failed to obtain the input of a BCBA, counselor, psychiatrist, or psychologist before it decided to change A.W.'s least restrictive environment to homebound.

d. The District refused to "schedule [special education] services until [A.W.'s] Parent gave to the District a location within the District where homebound services could be provided in a home setting."

e. The District breached the April 2018 settlement agreement and judgment "when the District attempted to place [A.W.] in a homebound placement and refused to provide the homebound services at a school or at a school district facility for more than one hour a day."

f. The District "decided to ignore the key provisions of the [April 2018] *Settlement Agreement* and order when it determined that it would provide homebound services for only one hour per day at the school."

g. The District "experienced great difficulty managing A.W.'s behaviors. However, based upon the records presented at the due-process hearing, the District was well aware of [A.W.'s] behaviors *prior* to entering into the [April 2018] settlement with [A.W.] and prior to the entry of the Hearing Officer's [April 2018 order and judgment]."

h. The District "had a duty to comply with the agreed-upon terms of the [April 2018 settlement agreement] with [A.W.]; and, if that were not enough, the District certainly had a duty to comply with the April 5,

2018 Order of the Hearing Officer. If the circumstances became such that the District believed this Hearing Officer's Order needed to be amended or modified, then, in the view of this Hearing Officer, the proper procedure would have been for the District to petition for a due process hearing pursuant to *Ala. Admin. Code R.* 290-8-90.08(9)(c)."

i.  The Hearing Officer also concluded that "there was no legally permissible procedure by which District could have unilaterally removed [A.W.] from the last agreed-upon placement, over the objection of the Parent, in order to relegate him to a disputed homebound placement, which clearly did not comply with the terms of the [April 2018 settlement agreement and judgment]."

98.  The hearing officer found that A.W. was the prevailing party, ruled that, as the hearing officer, he had no authority to order relief under the ADA, § 504, or § 1983, and advised the District of its appellate rights and applicable appellate deadlines.

99.  The District did not appeal.

**Count 1:**
**Claims for Damages Under § 504 of The Rehabilitation Act and**
**The Americans With Disabilities Act**

100. A.W. re-alleges, and incorporates by reference here, all of the preceding paragraphs.

101. Count 1 is a civil-rights claim against the ECBOE for money damages.

102. Because he suffers from physical and mental disabilities, A.W. is physically handicapped, cognitively impaired, and, thus, is "disabled" within the meaning of both the Americans With Disabilities Act and under § 504 of The Rehabilitation Act.

103. A.W. falls into the class of persons whose rights are specifically protected by the above-referenced federal laws.

104. At all times material to this case, the ECBOE knew that A.W. was physically handicapped, cognitively impaired, and, thus, disabled within the meaning of both the Americans With Disabilities Act and under § 504 of The Rehabilitation Act.

105. The ECBOE is an entity charged with the provision of a free, appropriate public education to A.W.

106.   The HCBOE receives money from the United States government to assist with the provision of a free, appropriate public education to students like A.W.

107.   Because the ECBOE receives this money, the ECBOE cannot discriminate against A.W. on the basis of his disabilities.

108.   As is set forth in the preceding fact sections, the ECBOE discriminated against him on the basis of his disabilities.

109.   Among other things, the ECBOE:

a.   violated the terms of the April 2018 settlement agreement and judgment;

b.   segregated A.W. from other handicapped and non-handicapped student on the basis of his disabilities by denying him access to school;

c.   failed to accommodate A.W. by denying him court-ordered access to resources that would have allowed him to obtain written and spoken language;

d.   failed to accommodate A.W. by denying him the behavioral care required by court judgment;

110.   A.W. belongs to the class of persons whom the ADA and § 504 were intended to protect.

111.   Persons employed by the District possessed actual notice of the discrimination and the possibility of other discrimination.

112.   The District employees who possessed notice included A.W.'s special-education teacher, A.W.'s general education teacher, the District special-education coordinator, the Millbrook Middle School assistant principal, and the Millbrook Middle School principal.

113.   Each of the above-listed persons possessed the authority to investigate, deter, and/or stop the discriminatory conduct but intentionally failed to do so or were deliberately indifferent to the discrimination.

114.   ECBOE's discriminatory conduct effectively excluded A.W. from participating in, and receiving full access to, the benefits of the programs and activities of the defendant ECBOE.

115.   The ECBOE's conduct was purposeful, done in bad faith, carried out with a discriminatory animus, and amounted to intentional discrimination against A.W. on the basis of his disability and in violation of the Americans With Disabilities Act, § 504 of The Rehabilitation Act, and their implementing regulations.

## Plaintiff's Damages

116.   As a result of the ECBOE's conduct, A.W. sustained the following damages:

a.    mental anguish and emotional distress, including fear, nervousness, sadness, fright, anxiety, humiliation, shock, shame, embarrassment, apprehension, and ordeal;

b.    loss of enjoyment of life;

c.    loss of the same educational opportunities as other handicapped and non-handicapped kids;

d.    loss of freedom; and

e.    loss of dignity.

## Prayer for Relief

117.   Based on the foregoing, A.W. asks:

a.    for the Court assume jurisdiction of his claims;

b.    for the Court to order a trial before a struck jury on all claims;

c.    for the jury to award to him compensatory damages against the ECBOE;

d.    when allowed by law, for the jury to award for punitive damages against the ECBOE;

e.    for the Court to enter judgment against the ECBOE;

f.    when allowed by law, for the Court to award attorneys' fees and costs to A.W.'s attorneys and against ECBOE; and

g.    as justice dictates, for the Court to grant any other relief deemed

necessary or appropriate by the Court including injunctive relief.

## Jury Demand

The plaintiff demands a trial on all counts by struck jury.

_____

H. L. "Max" Cassady Jr., Esquire (ASB 0819 Y86H)
William T. "Bo" Johnson, III (ASB 2310 M69J)

Counsel for the Plaintiffs
Cassady & Cassady, P.C.
23710 U.S. Hwy. 98, Suite D
Fairhope, AL 36532
251.578.5252 [telephone]
888.304.7262 [fax]
maxcassady@gmail.com

Counsel for the Plaintiffs
Kirby Johnson, P.C.
One Independence Plaza Drive, Suite 520
Homewood, Alabama 35209
205.458.3553 [telephone]
205.458.3589 [fax]
bjohnson@kirbyjohnsonlaw.com

**Defendant should be served by certified mail at the following address:**

Elmore County Board of Education
100 H.H. Robison Drive
Wetumpka, AL 36092