

Deposition of:

███ ███ **Due Process Hearing , Vol. II**

*March 8, 2019*

In the Matter of:

███ ███ **Vs. Elmore County Board Of  Education**

Freedom Court Reporting
800.808.4958 | calendar-freedom@veritext.com  | 205-397-2397

1                    BEFORE THE

2       ALABAMA STATE DEPARTMENT OF EDUCATION

3

4    CASE NUMBER:  19-05

5    ███████  ███████

6              Petitioner,

7        vs.

8    ELMORE COUNTY BOARD OF EDUCATION,

9              Respondent.

10

11                    VOLUME II

12

13           *  *  *  *  *  *  *  *  *  *  *

14           TESTIMONY AND PROCEEDINGS, taken

15   before the Honorable Michael Cole, as

16   Hearing Officer, and reported by Virginia

17   Denese Barrett, Court Reporter and

18   Commissioner for the State of Alabama at

19   Large, at the Elmore County Board of

20   Education, 100 H.H. Robinson Drive,

21   Wetumpka, Alabama, on the 7th day of March,

22   2019, commencing at approximately 9:00 a.m.

23           *  *  *  *  *  *  *  *  *  *  *

Page 391

1        EXAMINATION INDEX
2  TEMEYRA McELRATH
3  Direct Continued by Mr. Cassady ...... 6
4  Cross-Examination by Ms. Tatum ....... 267
5        EXHIBIT INDEX
6  PETITIONER'S EXHIBITS:        PAGE:
7  Exhibit 19 - Due Process Hearing Transcript    9
8  Exhibit 20 = 8/27/18 IEP Minutes        12
9  Exhibit 21 - Order and Judgment with Cover   57
10    Letter
11  Exhibit 22 - Notice and Invitation for     64
12    8/31/18 IEP Meeting
13  Exhibit 23 - 8/31/18 IEP Meeting        72
14  Exhibit 24 - Office Referrals, Restraint    80
15    Forms
16  Exhibit 25 -              80
17  Exhibit 26 - 8/31/18 IEP         118
18  Exhibit 27 - 9/28/18 IEP         159
19  Exhibit 28 - 9/14/18 IEP         139
20  Exhibit 29 - 9/14/18 IEP Minutes      161
21  Exhibit 30 - 9/28/18 IEP Minutes      172
22  Exhibit 31 - 12/13/2018 IEP        176
23  Exhibit 32 - Alabama Administrative Code  201

Page 393

1    A P P E A R A N C E S
2
3  FOR THE PETITIONER:
4  Mr. Bo Johnson
    KIRBY JOHNSON
5  One Independence Plaza Drive, Suite 520
    Birmingham, Alabama 35209
6
7  Mr. Henry Lomax "Max" Cassady, Jr.
    THE CASSADY LAW FIRM
8  14 S. Section Street
    Fairhope, Alabama 36532
9
10  FOR THE RESPONDENT:
11  Ms. Erika Perrone Tatum
    HILL, HILL, CARTER, FRANCO, COLE & BLACK
12  425 South Perry Street
    Montgomery, Alabama 36104
13
14
15
16
17
18
19
20
21
22
23

Page 392

1      EXHIBIT INDEX CONTINUED
2  PETITIONER'S EXHIBITS:        PAGE:
3  Exhibit 33 -            202
4  Exhibit 34 -            210
5  Exhibit 35 - 1/31/19 IEP       231
6  Exhibit 36 -            238
7  Exhibit 37 - 2/5/19 IEP        244
8  Exhibit 38 - 2/5/19 IEP Minutes     244
9  Exhibit 39 - 2/7/19 Notice of Proposal   249
10    and Refusal to Take Action
11  Exhibit 40 - Student Code of Conduct    249
12  Exhibit 41 - Student Code of Conduct    260
13
14
15
16
17
18
19
20
21
22
23

Page 394

1        HEARING OFFICER:  Okay.  We'll
2  go back on the record.  And this is day
3  two of the due process hearing.  We'll
4  continue with the witness.  I think
5  Mr. Cassady was still directing his
6  examination and had asked for some
7  documents.  And I think the witness was
8  going to locate those this morning if
9  they existed.  So I'll ask you to let
10  Mr. Cassady know what you found.
11       MS. McELRATH:  Okay.  I found
12  the meeting minutes for August 27th,
13  2018.
14       MR. CASSADY:  Just for the
15  record, these were not previously
16  produced, were they?
17       MS. TATUM:  Mr. Cassady is
18  correct.  They were not.  Well, they
19  weren't produced to him.  A copy was sent
20  to the mother following the IEP meeting
21  where she was provided a copy of the
22  meeting, but they were not sent to
23  Mr. Cassady as part of the Bates

2 (Pages 391 - 394)

Page 395

1 documents.
2      HEARING OFFICER:  Okay.  You can
3 have a seat, ma'am.  We'll continue
4 questioning by Mr. Cassady.
5      MR. CASSADY:  Judge, I want to
6 state for the record that the mother, she
7 parent as I've mentioned many times, she
8 manages a hotel and she has a conference
9 with corporate offices this morning at
10 nine a.m.
11      HEARING OFFICER:  No problem
12 whatsoever.
13      TEMEYRA McELRATH
14      The Witness, having been previously
15 duly sworn or affirmed to speak the truth,
16 the whole truth, and nothing but the truth,
17 testified as follows:
18      DIRECT EXAMINATION CONTINUED
19 BY MR. CASSADY:
20   Q.   Ms. McElrath, you were here all
21 day yesterday as the representative of the
22 district, weren't you?
23   A.   Yes.

Page 396

1   Q.   And you observed Ms. ████ in
2 this room all day yesterday, didn't you?
3   A.   I didn't.
4   Q.   Well, in other words, she was
5 sitting here?
6   A.   She was here.
7   Q.   All day.  And during the entire
8 day she sat there, she did not say
9 anything, did she?
10   A.   I don't know.
11   Q.   That you heard?
12   A.   I wasn't watching.
13   Q.   Okay.  Did you hear her say
14 anything?
15   A.   I didn't hear her say anything.
16   Q.   And at any time did she make a
17 gesture at you or some facial expression or
18 anything that would be considered by you to
19 be inappropriate?
20   A.   I wasn't looking at her.
21   Q.   And I'm just asking if you saw
22 anything like that.
23   A.   I didn't look at her.  So I don't

Page 397

1 know what she was doing.
2   Q.   All right.  Now, these meeting
3 minutes, where did you find these?
4   A.   In the student folder.
5   Q.   Okay.  And where is the original
6 student folder now?
7   A.   In my office.
8   Q.   Okay.  And I would like an
9 opportunity to see that original folder.
10 And could you get that during a break?
11   A.   I can.
12   Q.   And what does the student folder
13 contain?
14   A.   The records that were sent to
15 you.
16   Q.   Okay.  Now, did you also look for
17 the intellectual evaluation?
18   A.   I did.
19   Q.   Is there one?
20   A.   I did not find it.
21   Q.   All right.  Now, where did you
22 look?
23   A.   I looked in the records.

Page 398

1   Q.   And did you look in your E-mails
2 or otherwise to see if you ever received an
3 E-mail from anyone at the district about
4 getting that intellectual evaluation done?
5   A.   I didn't have any.  I didn't look
6 at my E-mails.
7   Q.   Okay.
8   A.   I went to the school this
9 morning.
10   Q.   Ma'am?
11   A.   I didn't go and get any E-mails,
12 look at any E-mails.
13   Q.   Now, I want to mark these as
14 Exhibit --
15      MR. CASSADY:  First, Judge, before
16 we -- we'd like to go ahead.  We'd admit as
17 an exhibit the first due process trial
18 transcript --
19      HEARING OFFICER:  Okay.
20      MR. CASSADY:  -- as 19.  We want
21 it in the record.
22      HEARING OFFICER:  All right.
23 Petitioner's Number 19.  Any objection,

3 (Pages 395 - 398)

Page 399

1 Ms. Tatum?
2      MS. TATUM:  Yeah.  I have an
3 objection.  I don't understand the
4 relevance of the first due process hearing.
5 We're here to litigate this due process
6 hearing.  And when we resolved the case at
7 mediation, we also stated that any claims
8 and issues, that those were all resolved.
9 So in my opinion, we are -- my objection is
10 we seem to be relitigating.  We resolved
11 the case.  We resolved the case in good
12 faith.  We had a mediation with Hearing
13 Officer Romine.  And the transcript is
14 irrelevant to the current due process
15 hearing.  And it's also prejudicial.  The
16 school system didn't even put on a case.
17 We agreed to resolve the issues through
18 mediation.
19      MR. CASSADY:  They sure did,
20 Judge.  And the reason that it's relevant
21 is because it contains very descriptive
22 incidences of conduct which they're now
23 claiming are the reasons -- those same

Page 400

1 types of incidences of conduct they're now
2 claiming are the reason that after the
3 settlement, after they had heard all of
4 that, discussing the same types of
5 incidences of conduct they settled and said
6 we agree for the judge to enter this as an
7 order that he will be at school for a full
8 school day.  And so it's relevant for the
9 same reason that I was examining her
10 yesterday on prior incidences of what they
11 say was unacceptable, violent conduct
12 towards people or property.
13      HEARING OFFICER:  Let me take that
14 under advisement.  I understand Ms. Tatum's
15 position on that.  You know, it was one day
16 of a hearing.  And I understand your
17 position as far as trying to show some of
18 the behaviors.  But it goes into a lot more
19 than that, and so I'll take it under
20 advisement.
21      MS. TATUM:  And one more.  It
22 defeats the purpose of trying to resolve
23 the case, Mr. Hearing Officer.  If you go

Page 401

1 through a hearing and then you say, okay,
2 we're going to go ahead and mediate the
3 case, then we might as well put on our
4 entire case instead of going through
5 mediation.
6      HEARING OFFICER:  I'll take it
7 under advisement.
8      MR. CASSADY:  And that raises
9 another -- well --
10   Q.  I've marked the minutes as
11 Plaintiff's Exhibit 20.  Ms. McElrath, you
12 do understand the April 5, 2018 judgment of
13 Judge Cole ordered the school district to
14 perform an intellectual evaluation?
15   A.  I did.
16   Q.  And you now agree that it was not
17 done?
18   A.  I said I could not find it.  It
19 was documented in the minutes that it
20 occurred, but I do not have the
21 documentation to support that.
22   Q.  Have you conducted a reasonable
23 search of the records of the district to

Page 402

1 determine if it ever was done?
2   A.  I did the best I could with the
3 time that was given to me.
4   Q.  Well, this due process complaint
5 was filed a good while ago.  Since this due
6 process complaint was filed -- and you did
7 know it had to do with breaching the
8 judge's order or not following the judge's
9 order, right?
10   A.  You asked me for those documents
11 yesterday, and I went looking for what you
12 were asking for support.
13   Q.  Now, is there any reason that any
14 members of the IEP team would not be
15 permitted to see the judge's order that you
16 know of?
17   A.  The IEP members to see the
18 judge's order?
19   Q.  Right.
20   A.  No.
21   Q.  Okay.  And so as members of the
22 IEP team, then they also could have it in
23 his file, in his special education file

4 (Pages 399 - 402)

Page 403

1 because nobody gets to see that except
2 people with permission to see his special
3 education materials, right?
4    A.   Normally what happens when we
5 have that, an order --
6        MR. CASSADY: I'm asking for a yes
7 or no, Your Honor. You said it at the
8 beginning of this hearing.
9    Q.   Yes or no? Are only --
10   A.   Can I explain?
11   Q.   No, ma'am. You can when I'm
12 done.
13   A.   Okay.
14   Q.   Yes or no. Are only people that
15 are permitted to see his special education
16 file permitted to see his special education
17 file?
18   A.   They are able to see his special
19 education file.
20   Q.   Yes or no?
21   A.   They can see his file. Yes.
22   Q.   Yes or no? Can anyone -- can
23 only --

Page 404

1    A.   Yes.
2    Q.   Thank you.
3    A.   But --
4    Q.   Go ahead.
5    A.   I want to complete. They can see
6 his educational file. But when there's a
7 settlement agreement, I take the agreement
8 to the meeting and I review it with the
9 team. I take that agreement back and put
10 it in confidentiality for safe keeping.
11   Q.   So you're saying --
12   A.   It doesn't stay at the school
13 level. It doesn't stay at the school
14 level.
15   Q.   So if a special education teacher
16 looked at his special education file, they
17 would not see the judge's order?
18   A.   They would see what has been
19 decided on as far as what we must do in
20 order to comply with that settlement.
21   Q.   Show me the page that that is in
22 in the special education file.
23       MS. TATUM: Objection, Mr. Hearing

Page 405

1 Officer. It's been asked and answered. We
2 went through that yesterday from the May
3 8th IEP meeting.
4        MR. CASSADY: This is your
5 judgment. This is the judgment of this
6 administrative body. And she has said --
7 she's trying to do a back door explanation
8 that no, we keep the judge's order in this
9 case that declare what his special
10 education rights are, we keep the judge's
11 judgment in a confidential file, not in the
12 special education file. But if they read
13 the special education file, they'll know
14 what the judgment says.
15       HEARING OFFICER: Overrule the
16 objection.
17       MS. TATUM: Objection to his
18 characterization.
19       HEARING OFFICER: Overrule the
20 objection.
21       MS. TATUM: Ms. McElrath's
22 testimony was not as Mr. Cassady
23 characterized it.

Page 406

1        HEARING OFFICER: The record will
2 reflect what the testimony was. I'll
3 overrule the objection. You can answer it.
4 Is there any document in the record that
5 would show that there is an order at
6 another location?
7    A.   It would show -- no. It would
8 only show that there was a discussion of
9 the settlement agreement as referenced as a
10 settlement agreement. And those things are
11 put in place in the different parts of the
12 IEP.
13   Q.   Where is that document, ma'am?
14       MS. TATUM: Mr. Hearing Officer, I
15 would ask for an instruction that
16 Mr. Cassady treat the witness with respect.
17 He's being very aggressive toward her.
18 We've just started the day. There hasn't
19 been any difficult testimony.
20       HEARING OFFICER: You are a little
21 bit aggressive today.
22       MR. CASSADY: And may the record
23 reflect when I asked that question that I'm

5 (Pages 403 - 406)

Page 407

1 sitting here in my chair with my laptop.
2     Q.    And my question was where is the
3 document, ma'am?
4         HEARING OFFICER: We're going to
5 be very calm today. So, you know, it goes
6 both ways.
7     Q.    Ma'am, where is the document?
8         HEARING OFFICER: The witness
9 needs to be polite to the attorneys and the
10 attorneys need to realize that this is an
11 informal administrative hearing and
12 everybody has a role. We just need to keep
13 it as low key as we can.
14     A.    On page six seventy-nine are the
15 minutes. And under the discussion part it
16 says discussed settlement. And it points
17 out the key things that we discussed
18 regarding the settlement on page six
19 seventy-nine, six eighty, six
20 eighty-one.
21     Q.    Please read verbatim -- please
22 read verbatim into the record, please, the
23 key things we discussed regarding the

Page 408

1 settlement. Please read that into the
2 record verbatim and name the document,
3 please.
4     A.    In it it says discussed
5 settlement. So that would have been the
6 entire settlement agreement that we've had.
7 What key points were also identified with
8 the discussion of the settlement would have
9 been the sign language interpreter, the
10 one-on-one parapro, quarterly IEP meeting,
11 interpreter and provide eval results for
12 parent, summer camp at AIDB. AIDB will be
13 in contact with Mom about which summer camp
14 he will attend. If ▓▓▓ is homebound,
15 services will be provided at school
16 location. Receive extended school year
17 unless it is determined that another
18 service would be better suited for him.
19 Assessments completed, speech, assistive
20 technology, IQ, achievement, behavior plan.
21 IEP draft was discussed. Parent concerns
22 none. Behavior plan completed.
23 Transportation, if ▓▓▓ cannot ride bus

Page 409

1 due to behavior. Speech achievement
2 results discussed. Last year was the last
3 time he went to the eye doctor. Will take
4 him again and send school results. No
5 concerns about participation in the AAA
6 based on IQ scores. AT eval covered.
7 Recommendation discussed. Mom has device
8 that plugs into his implant that serves as
9 earphones. Will send to school. Text to
10 speech will be put on iPad and Chromebook.
11 Free apps, send Mom list. Signing Times
12 interpreter will decide if appropriate.
13 Adaptive P.E. eval covered. ▓▓▓ does not
14 meet qualifications for adaptive P.E.
15 Discussed modifications for hearing. Mom
16 had no questions, concerns about goals and
17 services. The possibility of going to MMS
18 was discussed but no decision was made at
19 this time because a Millbrook -- that's all
20 it says there.
21     Q.    What page? What page are you on
22 now, please, if you would tell us?
23     A.    Oh, I'm sorry. Okay. That was

Page 410

1 six eighty that I was on. I'm on six
2 eighty-one now. It says FBA/BIP was
3 discussed. Mom had no questions, concerns.
4 Ms. Blassingame reported that pressure was
5 working. Mom said it was fine with her.
6 Mr. Mayer covered suggestions for handling
7 anger and ABC recording log for
8 misbehavior. That's page six eighty-one.
9     Q.    And would you please tell the
10 Court what day those minutes were taken
11 that you're reading from?
12     A.    May 8th.
13     Q.    And would you please tell the
14 Court who wrote those minutes?
15     A.    It doesn't indicate it here.
16     Q.    And will you please tell the
17 Court if you recognize the handwriting?
18     A.    I do not.
19     Q.    Will you please tell the Court
20 who was present that day?
21     A.    It says the attendees Temeyra
22 McElrath, Troy Salter, Jack Mayer, Sharon
23 Jones, Rashawn Blassingame, Sylvia Daniel.

6 (Pages 407 - 410)

Page 411

1  Q.  Will you please tell the Court
2  who ordinarily took minutes at the IEP
3  meetings?
4  A.  Say it again.
5  Q.  Would you please tell the judge
6  who ordinarily took the minutes if you were
7  present at the IEP meeting?
8  A.  It varied.
9  Q.  So will you please tell the Court
10  if you have any idea at all who wrote these
11  minutes?
12  A.  I do not.
13  Q.  And when you say that on page six
14  eighty-one, quote, Ms. Blassingame reported
15  that pressure was working, period, Mom said
16  it was fine with her, would you please tell
17  the Court what that means?
18  A.  I don't know.
19  Q.  Where it says on the same page,
20  quote, FBA forward slash BIP was discussed,
21  period. Mom had no question forward slash
22  concerns, end quote. Would you please tell
23  the judge what was discussed?

Page 412

1  A.  I wouldn't be able to tell you at
2  length what was discussed. The functional
3  behavior plan, behavior assessment and the
4  behavior intervention plan was discussed.
5  That's all I can give you. I wouldn't have
6  the details.
7  Q.  Now, was there -- so the
8  confidential settlement -- well, the order
9  and judgment of the Court, is it here on
10  this premises, the original that you say is
11  locked away?
12  A.  The original?
13  Q.  Yes, ma'am.
14  A.  I'm sure it is.
15  Q.  Okay. Would you please be able
16  to go get that during a break so that we
17  could look at the original?
18  A.  Okay.
19      MS. TATUM: I'm going to speak to
20  that. I don't think Ms. McElrath has the
21  original. I think the original is at my
22  office or the original could have been sent
23  to Hearing Officer Romine. I mean, I could

Page 413

1  call my office and check on the break, but
2  usually the special education director does
3  not have the original.
4  A.  When he said that, I assume it
5  was a copy that I received. So he said
6  could I go get a copy. The original is
7  what is sent to me that I discussed at the
8  IEP. So I can go get it, which I can print
9  you a copy.
10      HEARING OFFICER: What's your
11  point, Mr. Cassady?
12      MR. CASSADY: Well, I want to see
13  the document that she -- the testimony has
14  been, Your Honor, that the settlement
15  agreement, that there's one copy, that they
16  keep it locked away here somewhere on these
17  premises. And I want to see it because --
18      HEARING OFFICER: She'll bring it
19  to you. Let's move along. We're really
20  slow on this. We spent about six hours on
21  this witness yesterday.
22      MR. CASSADY: Yes, sir.
23  Q.  Now, the August 20, 2018 IEP

Page 414

1  meeting, is there anything in the minutes
2  about reviewing Judge Cole's settlement --
3  I mean Judge Cole's order and judgment at
4  that IEP meeting?
5  A.  I do not see it on that. The
6  principal was present on May 14th via
7  phone. She participated to talk about the
8  transition for him.
9  Q.  Please, ma'am, will you state yes
10  or no whether --
11  A.  It is not on the August 20th
12  documentation that I have that it was
13  discussed, but the settlement agreement
14  does not have to be discussed. In an IEP
15  meeting if there is something I need to
16  make the case manager aware of, I can
17  discuss that with the case manager just to
18  make sure. Because what was happening at
19  this time, he was at ICARE at an
20  alternative placement and we were
21  transitioning him to the middle school. So
22  you have two schools. So where it was
23  originally discussed was at the alternative

7 (Pages 411 - 414)

Page 415

1  school and then he went to the middle
2  school.
3     Q.   Who was the -- so the settlement
4  of the order and judgment of Judge Cole --
5     A.   I'm not trying to be rude, sir.
6  I need to stand for a second. I'm having
7  back spasms.
8        HEARING OFFICER: Sure.
9     Q.   The order and judgment of Judge
10 Cole, you're saying it was at the May 2018
11 IEP meeting which was held at the
12 alternative school?
13    A.   The May -- the May 8th meeting.
14    Q.   The minutes you were just reading
15 from, those are from -- were from May of
16 2018, right?
17    A.   Yes. That would have been at
18 ICARE.
19    Q.   Right.
20    A.   Yes.
21    Q.   And that's where Mr. Troy Salter
22 used to --
23    A.   Yes.

Page 416

1     Q.   -- have him full-time?
2     A.   Uh-huh.
3     Q.   And, please, if it's okay, if you
4  would let me finish my question. I don't
5  want to be rude, and I'm trying very hard
6  not to be. But if you would please let me
7  finish my question so that the court
8  reporter can finish typing my question
9  before you answer. Would you please do
10 that?
11    A.   I can do that.
12    Q.   Thank you. Now, did you say that
13 the next IEP meeting for August 20, 2018
14 was at a different location?
15    A.   Yes.
16    Q.   And what location was that?
17    A.   Millbrook Middle.
18    Q.   And did you say that the IEP team
19 did not have to have the settlement
20 agreement or the judge's order at that
21 meeting?
22    A.   We would have already discussed
23 his transition because actually, ███ was

Page 417

1  set to --
2        MR. CASSADY: Your Honor, if I may
3  address the Court.
4        HEARING OFFICER: Do a yes or no,
5  and then you can explain.
6     Q.   Do I need to ask the question
7  again?
8     A.   Yes, please.
9     Q.   Okay. Was the judge's order and
10 judgment at the August 20, 2018 IEP
11 meeting?
12    A.   No.
13    Q.   Was the judge's order and
14 judgment at the May 27th, 2018 -- I'm
15 sorry. Strike that. Was the judge's order
16 and judgment at the August 27, 2018 IEP
17 meeting?
18       MS. TATUM: While she's looking,
19 my reading glasses are in the car.
20       HEARING OFFICER: Sure. We won't
21 start back until you get in.
22       (Brief pause)
23       HEARING OFFICER: Okay.

Page 418

1     A.   No, they were not. But it's
2  indicative in the minutes that the part of
3  the settlement of what we were to do was
4  discussed because when looking at homebound
5  as an option, it talked about transition
6  and that his homebound services being at
7  Millbrook Middle School.
8     Q.   And you're reading from what
9  minutes?
10    A.   The minutes that I gave you
11 today.
12    Q.   Which have been marked as
13 Plaintiff's Exhibit 20?
14    A.   Uh-huh. I have a copy here.
15    Q.   Okay. If you would say yes for
16 the record, please.
17    A.   Yes. Uh-huh.
18    Q.   Thank you.
19       HEARING OFFICER: Any objections
20 to Petitioner's Exhibit Number 20 which are
21 the minutes that you brought in?
22       MS. TATUM: No objection.
23       HEARING OFFICER: No objection

8 (Pages 415 - 418)

Page 419

1 being made, Petitioner's Exhibit Number 20
2 is admitted.
3        MR. CASSADY: Can I staple this,
4 Your Honor?
5        HEARING OFFICER: Yes, please.
6   Q.   Okay.
7   A.   Can I continue?
8        HEARING OFFICER: Next question.
9   Q.   Do you remember what the question
10 was?
11  A.   You can repeat it, if you'd like?
12  Q.   Do you remember what the question
13 was?
14  A.   Repeat it.
15  Q.   The question is, first, who is
16 required to be at an IEP meeting by law?
17  A.   The -- a general ed teacher, a
18 special ed teacher, someone who can
19 interpret the results, the parent and an
20 LEA.
21  Q.   And who was the special education
22 teacher present at the May IEP meeting in
23 2018?

Page 420

1   A.   Sylvia Daniel.
2   Q.   Was she the special education
3 teacher for ███ ███
4   A.   She was at that time.
5   Q.   Has she been -- who is now his
6 special education teacher?
7   A.   Tina Perry.
8   Q.   And when did Tina Perry become
9 his special education teacher?
10  A.   August of -- August 2018.
11  Q.   What date in August?
12  A.   It would have been August 7th,
13 but he didn't arrive until the 13th.
14  Q.   And what was her name again,
15 please?
16  A.   Tina Perry.
17  Q.   And so the special education
18 teacher who attended the May 2018 IEP
19 meeting was not his special education
20 teacher when he started school?
21  A.   She was not.
22  Q.   And was Tina Perry present at
23 both of the August 2018 IEP meetings?

Page 421

1   A.   Yes.
2   Q.   Did she sign both days?
3   A.   That's the other book, the August
4 20th IEP. Sir, I think it is in another
5 book.
6        HEARING OFFICER: Okay.
7 Ms. Tatum --
8        THE WITNESS: The one with the
9 tabs.
10       MS. TATUM: Oh, yeah. I was
11 trying to remember.
12       HEARING OFFICER: I understand.
13 There's several notebooks up there.
14  A.   Yes. The answer to your question
15 is yes.
16  Q.   And what tab are you looking at?
17  A.   5.
18  Q.   Now, if you would, turn to the
19 minutes of the August 27, 2018 IEP which is
20 Plaintiff's 20. First may I ask, please,
21 do you know who wrote these minutes?
22  A.   I do not.
23  Q.   Would you read into the record,

Page 422

1 please -- no, first, the Plaintiff's
2 Exhibit 20 represents the entire -- first,
3 what are the purpose of minutes? Why are
4 minutes written? You're the special
5 education coordinator. Why are minutes
6 written in an IEP meeting?
7   A.   We try to document what was
8 discussed.
9   Q.   Okay.
10  A.   It's like a summary or a snapshot
11 of what was discussed.
12  Q.   Thank you.
13  A.   Uh-huh.
14  Q.   And would you mind reading to the
15 judge verbatim into the record -- if I may
16 hand this to you. If you would read it
17 verbatim into the record.
18       HEARING OFFICER: We're not going
19 to do that, Mr. Cassady. It's a document.
20 It's evidence. We're not going to spend
21 the time having someone read a document.
22       MR. CASSADY: Yes, sir. Yes, sir.
23  Q.   So it says phone conference --

9 (Pages 419 - 422)

Page 423

1 under discussion, phone conference August
2 27, 2018 ten ten a.m., correct?
3 A. Correct.
4 Q. Next it says, quote, Discussion
5 one, colon, refusal to go to P.E., forward
6 slash if he goes and doesn't want to, he
7 will get out, end quote?
8 A. Act out.
9 Q. Act out. Thank you. And do you
10 remember anything about that conversation?
11 A. That we discussed if he was
12 willing to go to P.E.
13 Q. These are the minutes that
14 resulted in him being removed from a full
15 day of school and riding on the bus to and
16 from school, true?
17 A. Homebound was discussed.
18 Q. Okay. Well, wasn't the IEP --
19 isn't there an August 27, 2018 IEP that was
20 issued on this day --
21 A. Yes.
22 Q. -- that puts him on homebound?
23 A. Yes.

Page 424

1 Q. For one hour a day?
2 A. Yes.
3 Q. The next entry, it says
4 discussion two, colon, working with
5 therapists, period. Mom is trying to look
6 at options?
7 A. Uh-huh.
8 Q. Do you remember anything that was
9 discussed in that regard?
10 A. That mom was working with a
11 therapist for him.
12 Q. Do you remember anything else?
13 A. No, I do not.
14 Q. Next one says, quote, Is -- all
15 caps, MMS -- quote, is, all caps, MMS, end
16 all caps, his best environment, question
17 mark. He is putting property as well as
18 staff forward slash students in jeopardy,
19 end quote. Do you remember any further
20 discussion about that?
21 A. Only that his behavior had turned
22 very violent.
23 Q. All right. And the next one

Page 425

1 says, quote, all caps, ICARE, I-C-A-R-E,
2 end all caps, to, all caps, MMS, end all
3 caps. And that means from the alternative
4 school, Troy Salter to Millbrook Middle
5 School, correct?
6 A. Yes.
7 Q. And then it says, quote, Behavior
8 is the same, comma, if not worse, end
9 quote. Did I read that correctly?
10 A. Yes.
11 Q. Do you remember anything else
12 that was discussed about that?
13 A. It would have been his behavior.
14 The specifics I do not.
15 Q. Okay. And then it says, quote,
16 Discussion on homebound options, comma, as
17 well as giving him the best options. Do
18 you remember anything else that you can
19 elaborate on that minute entry?
20 A. Only that homebound was an
21 option, but it wasn't an only option, that
22 we were trying to make sure we had -- we
23 efficiently explored all our options for

Page 426

1 him.
2 Q. And what were the other options,
3 if you remember?
4 A. I don't remember.
5 Q. And the next one says, quote, all
6 capps, ICARE, end all caps, has not been
7 successful, end quote?
8 A. Uh-huh.
9 Q. All right. Do you remember
10 anything about the discussion for that
11 minute entry?
12 A. What we discussed beyond that it
13 was not successful? Like I said, it would
14 have been documentation of behaviors he
15 exhibited prior to leaving ICARE.
16 Q. And then the next entry says,
17 quote, Smaller class size has not seemed to
18 help his behavior, end quote. Do you
19 remember anything about the discussion on
20 that minute entry?
21 A. We talked about class size.
22 Q. Do you remember anything about
23 that conversation?

10 (Pages 423 - 426)

Page 427

1    A.   Details? The specifics?
2    Q.   Anything.
3    A.   That we talked about class size.
4    Q.   Anything else?
5    A.   The class size of the student --
6  I mean of the classroom.
7    Q.   Is there anything else?
8    A.   And his behavior.
9    Q.   Is there anything else you
10  remember about that minute entry?
11    A.   No, I do not.
12    Q.   Then it says, quote, Behavior
13  specialist Friday coming back for another,
14  end quote. What does that minute entry
15  mean?
16    A.   That behavior specialist was
17  coming back to Millbrook Middle School for
18  another visit meaning that there was a
19  visit prior to this meeting taking place
20  and was going to be back on Friday.
21    Q.   Well, and that would be -- that
22  would indicate that the -- because the
23  notice -- the notice for this August 27 IEP

Page 428

1  meeting which is Plaintiff's Exhibit 6 was
2  sent on -- it says date notice sent, August
3  24th, 2018 which I'll represent to you as
4  the Friday before the August 27, 2018 IEP
5  meeting.
6    A.   Uh-huh.
7    Q.   Okay.
8    A.   Yes.
9    Q.   And so does that indicate to you
10  that the first time that the behavioral
11  specialist had been to see the child had
12  been on the day, the last day that he
13  attended Millbrook Middle School?
14    A.   I wouldn't know the exact date
15  that the behavior specialist came.
16    Q.   Do you have any records here at
17  this school board facility that would show,
18  for instance, the contract or the
19  arrangements with -- with The Learning Tree
20  representative that was required by Judge
21  Cole's order?
22    A.   Yes.
23    Q.   What do you -- what document are

Page 429

1  you looking at, please?
2    A.   Seven 0 six.
3    Q.   And is that -- would you describe
4  to the judge what that document is?
5    A.   It's a consent for applied
6  behavior analysis services.
7    Q.   All right. And what is the date
8  of that?
9    A.   8/20/18.
10    Q.   Okay. And that would have been
11  presented to Ms. ███ a week before that
12  August 20, 2018 IEP meeting?
13    A.   Uh-huh.
14    Q.   And she signed it?
15    A.   Yes.
16    Q.   And so despite the April 5, 2018
17  judgment from Judge Cole, Ms. ███ was
18  not asked to sign the consent for The
19  Learning Tree behavioral specialist to work
20  with the child until the IEP meeting of
21  August 20, 2018, true?
22    A.   We gave -- we gave the paperwork
23  to Ms. ███  We never received it. When

Page 430

1  we received it, we put it in action. So to
2  receive it is the date that I have here,
3  but we never had any paperwork prior to
4  that.
5    Q.   Show me, please, in the school
6  board records where you gave that consent
7  form to Ms. ███ before August 20, 2018.
8    A.   I don't have record of it.
9    Q.   Did you do it yourself?
10    A.   I remember her receiving the
11  paperwork to give us permission for BCBA.
12  Once we are given permission, then we can
13  get the BCBA.
14    Q.   And you remember her receiving
15  the paperwork?
16    A.   I remember giving the paperwork.
17    Q.   Where did you give it to her?
18    A.   At the May meeting.
19    Q.   All right. Do you remember
20  testifying yesterday that you hadn't asked
21  her to sign that consent form at the May
22  meeting?
23    A.   This form here? I didn't ask her

11 (Pages 427 - 430)

Page 431

1  to sign this form. But she was given forms
2  for consent. Now, those could have been --
3  and even if it wasn't in the May meeting,
4  she was given the forms prior to.
5      Q.  Well --
6      A.  The -- let me clarify. The
7  August meeting would not have been the
8  first time we attempted to get consent from
9  the parent. That would not have been our
10 first time.
11     Q.  Well, show us in the records.
12     A.  I don't have the records to be
13 able to show you.
14     Q.  All right. Have you looked for
15 them?
16     A.  I don't have any records, any
17 other records. I don't have anything else.
18     Q.  But you're saying that before the
19 August 20, 2018 IEP meeting you gave that
20 form to Ms. --
21     A.  Not this form but the consent for
22 BCBA. We have to do a notice of consent
23 for her to give us permission, because with

Page 432

1  the consent that they give us -- that we
2  give them, it shows that the parent is
3  allowing an FBA to be completed by The
4  Learning Tree. Now, that may or may not
5  have been in a meeting. But up until May,
6  until the end of May she was communicating
7  with us. So we could have very well given
8  her forms to complete and to be in
9  compliance. But I don't have the
10 documentation to show that.
11     MS. TATUM: Mr. Hearing Officer,
12 because Mr. McElrath is having back spasms
13 today, if she needs to get up, is it okay?
14     HEARING OFFICER: Absolutely.
15     MS. TATUM: I want her to be able
16 to testify today. I don't want to send her
17 home.
18     HEARING OFFICER: She's already
19 gotten up once to stand up. I understand.
20     MS. TATUM: Okay. I just want to
21 make sure if she gets up --
22     HEARING OFFICER: You can walk
23 around. You can take a break if you need

Page 433

1  one. Just let me know.
2      THE WITNESS: Thank you.
3      MS. TATUM: If you need to take
4  some medication as long as you can still
5  testify.
6      Q.  Isn't there supposed to be a
7  written record, please, ma'am, of when you
8  send a request for consent to a parent
9  under IDEA regulations?
10     A.  At the settlement agreement when
11 we had the meeting, there were some forms
12 that would have been sent to you that you
13 would have been able to give to her that we
14 agreed on at that time.
15     Q.  And your testimony is those were
16 never received?
17     A.  We never received anything back
18 from the parent until, like I said, August
19 20th we got permission. And when we got
20 permission, we put it into action.
21     Q.  Okay. Now, so -- so is it --
22 from your records, please, ma'am, are you
23 able to identify any day before Friday,

Page 434

1  August 24, 2018 that the behavioral
2  specialist ever met with the child?
3      A.  I'm not able to identify that in
4  the record. Only that it indicates the
5  behavior specialist coming back. So that
6  indicates that the behavioral specialist
7  has been there but they were coming back
8  Friday.
9      Q.  Do you receive itemized bills
10 from the behavioral specialist detailing
11 what their services were?
12     A.  No.
13     Q.  Who --
14     A.  I actually received an invoice
15 for their services, but it doesn't detail
16 schedule and it doesn't identify the
17 student names by name.
18     Q.  Would it be a burden for you to
19 check for any E-mails relating to ▆▆▆▆
20 ▆▆▆ from the behavioral specialist?
21     HEARING OFFICER: If you'll check.
22     MS. TATUM: To be clear, the
23 school district has a behavior specialist,

12 (Pages 431 - 434)

Page 435

1  Jack Mayer. Are you asking for that, or
2  for the board certified behavior analyst?
3      MR. CASSADY: I'm asking for the
4  board certified behavioral analyst.
5      Q.   Now, the next entry says in the
6  minutes of August 27, 2018, quote,
7  Homebound pros, colon, no danger,
8  parenthesis, less danger, close
9  parenthesis, to others at, all caps, MMS,
10 end all quotes. Did I read that right?
11     A.   Yes.
12     Q.   Do you remember anything else
13 that was discussed about the pros of
14 homebound?
15     A.   I don't remember the details of
16 our conversation.
17     Q.   Do you remember anything
18 generally otherwise that was discussed
19 about the pros of homebound?
20     A.   I don't remember anything beyond
21 what you're saying.
22     Q.   Do you remember anything -- now,
23 there are no discussions of the cons of

Page 436

1  homebound in these minutes, are there?
2      A.   That doesn't mean they weren't
3  discussed because we have someone that's
4  taking the minutes.
5      Q.   Do you remember anything about
6  the cons discussed about --
7      A.   I don't remember the details of
8  the conversation.
9      Q.   Do you remember anything
10 generally about a discussion of cons --
11     A.   I do not.
12     Q.   -- of homebound?
13     A.   I do not.
14     Q.   If you --
15     HEARING OFFICER: Let him finish
16 the question, if you don't mind.
17     THE WITNESS: I'm sorry. I
18 apologize.
19     Q.   Do you remember anything from the
20 August 27, 2018 IEP meeting about --
21 specific or generally a discussion about
22 the cons of a homebound placement?
23     A.   I do not remember.

Page 437

1      Q.   The next entry says, all caps,
2  option, end all caps, colon, homebound
3  transition time, period. Maybe an hour at,
4  all caps, MMS, period. As behavior gets
5  better forward slash improves, comma, we
6  can work towards a full day at, all caps,
7  MMS, period, end all caps. Do you remember
8  anything more than that minute entry about
9  that particular subject?
10     A.   I do not.
11     Q.   Do you remember anything specific
12 or general at all about that subject?
13     A.   I do not.
14     Q.   The next entry says, quote,
15 Contact Morgan --
16     A.   Morgan.
17     Q.   -- Marshall?
18     A.   Right.
19     Q.   What does it mean in the minutes
20 where it says, quote, Contact Morgan
21 Marshall, end quote?
22     A.   To call Morgan Marshall who is
23 the BCBA for The Learning Tree.

Page 438

1      Q.   All right. And then the next --
2  do you remember anything specific about
3  that conversation?
4      A.   I do not.
5      Q.   Do you remember anything general
6  about that conversation at the IEP meeting?
7      A.   I do not.
8      Q.   Then it says, quote, Speech at,
9  all caps, MMS, end all caps. What does
10 that mean?
11     A.   Speech was discussed for him at
12 Millbrook Middle School, speech services.
13     Q.   Do you remember anything specific
14 more than what you just said that was
15 discussed?
16     A.   I do not.
17     Q.   Do you remember anything
18 generally that was discussed more than that
19 entry itself?
20     A.   I do not.
21     Q.   And then the last entry in the
22 minutes is -- it has a star. And it says,
23 quote, Wednesday, colon, capital W, Where

13 (Pages 435 - 438)

1 to transport ████ period, end quote.
2 What does that mean?
3    A.   That by Wednesday we'd know where
4 to transport him, transport ████  That
5 we'd know where to transport ████
6    Q.   Do you remember anything that the
7 mother said at this August 27, 2018 IEP
8 meeting?
9    A.   Nothing that I haven't already
10 stated. I don't remember.
11    Q.   Okay. Nothing more than what
12 you've already testified to?
13    A.   No. Unh-unh.
14    Q.   So ████ did not come back to MMS
15 after that day, did he?
16    A.   I don't know. That was the 27th.
17    Q.   That was the day that he was put
18 on homebound, correct?
19    A.   I'll have to go back and look at
20 the IEP to make sure that I'm speaking
21 correctly. Yes.
22    Q.   All right. So as a result of the
23 August 27, 2018 IEP -- and we just read the

1 minutes -- he went from a full day at
2 Millbrook Middle School being transported
3 to school and then home on the bus to one
4 hour per day where he was going to be
5 picked up at home, taken to school for an
6 hour and then he would be taken back on a
7 bus home. Is that what the May 27, 2000 --
8 I'm sorry -- August 27, 2018 IEP concluded?
9    A.   We're trying to determine as far
10 as when he would leave. Yes.
11    Q.   Okay. Is the answer yes?
12    A.   Yes.
13    Q.   Now, why, then, was there another
14 IEP meeting? Were there any more IEP
15 meetings -- well, I'm going to withdraw
16 that question. Okay. And I want to back
17 up and ask one more question about the
18 August --
19    A.   August 27th was not his last day
20 at Millbrook Middle School.
21    Q.   Okay. So as of August 27, 2018,
22 he was put on a homebound program, right?
23    A.   He was homebound from the

1 beginning, but the homebound service that
2 he was -- he was homebound. It says --
3 from August 27th, the homebound -- on
4 August 27th the team decided that homebound
5 services would be at Millbrook Middle
6 School for one hour with transition plan in
7 place to increase his time there. But
8 he -- there's -- he was there on the 30th.
9    Q.   Okay. And could you explain to
10 Judge Cole why the full-time interpreter
11 that had been ordered by Judge Cole was not
12 present at the August 20, 2018 and August
13 27, 2018 IEP meetings?
14       MS. TATUM:   Objection. It's been
15 asked and answered. We have already
16 covered this. She already testified
17 regarding that it was continuing to be
18 implemented even if it wasn't at the IEP
19 meetings.
20       HEARING OFFICER:   Overruled. You
21 can answer the question.
22    A.   Why the sign language interpreter
23 wasn't present at the IEP meeting?

1    Q.   Yes.
2       HEARING OFFICER:   Yes, ma'am.
3    Q.   The IEP meetings of August 20 and
4 August 27, 2018?
5    A.   I wouldn't be able to tell you.
6 I don't know.
7    Q.   Is there anyone else other than
8 that sign language interpreter that knew
9 how to communicate with ████
10    A.   The teacher was communicating
11 with him and the aide as best as they knew
12 how. This was a new environment for him.
13    Q.   And he has, by your own testing
14 after the judge entered his order, the
15 functioning level of the mind of a
16 two-year-old, right?
17    A.   One of the tests indicated that.
18    Q.   So -- so is there any way you
19 could tell the judge how much time
20 Ms. ████ had to prepare for the August
21 27, 2018 meeting? She received according
22 to your testimony the notice on the Friday
23 before which was August 24. And your

14 (Pages 439 - 442)

Page 443

1  minutes state that the minutes started at
2  ten ten a.m. Can you tell us how much time
3  she had to prepare?
4      A.  I do not know.
5      Q.  Can you tell us how that notice
6  would have been sent to her for the -- this
7  notice which has been marked as Plaintiff's
8  Exhibit 6? It's dated 8/24/2018 which is a
9  Friday. It says date and notice was sent.
10 And then the meeting date is the following
11 Monday, August 27, 2018 at ten a.m. at
12 Millbrook Middle School. And could you
13 tell Judge Cole, please, how it was that
14 this notice was sent to her?
15     A.  I don't know.
16     Q.  Now, may I please approach the
17 witness?
18         HEARING OFFICER: Yes.
19     Q.  What does it say here under
20 results of first attempt on Plaintiff's
21 Exhibit 6?
22     A.  Parent did not return notice.
23 Ms. ▇▇▇▇ requested to participate by

Page 444

1  phone conference.
2      Q.  Okay. And then it says second
3  attempt?
4      A.  There's nothing on the second
5  attempt because Ms. ▇▇▇▇ -- the result
6  was Ms. ▇▇▇▇ participated via phone
7  conference.
8      Q.  Now, is there anything in the
9  records that you have that would show when
10 it was decided what time on Friday whether
11 it was eight a.m. in the morning or three
12 o'clock in the afternoon, what time it was
13 decided that there would be an IEP meeting
14 at ten a.m. on the following Monday?
15     A.  I wouldn't know. I wasn't at the
16 school. So I wouldn't know what time any
17 decision was made.
18     Q.  And you agree that Ms. ▇▇▇▇ was
19 not provided with the documents required by
20 Judge Cole's order prior to the IEP
21 meeting? You agree?
22     A.  What documents are you referring
23 to?

Page 445

1      Q.  Well, she never got the
2  evaluations, did she --
3      A.  They were --
4      Q.  -- that were required by Judge
5  Cole's order?
6      A.  They were mailed to her.
7      Q.  Oh, where is your record of that?
8      A.  I don't have record of that.
9      Q.  And when were they mailed to her?
10     A.  I don't remember. I don't know.
11 I didn't mail the records. The school
12 would mail any records and any --
13     Q.  Who told you the evaluations
14 ordered by Judge Cole to be provided to her
15 had been mailed to her?
16     A.  Who told me they were?
17     Q.  Who told you that?
18     A.  Ms. Sylvia Daniel.
19     Q.  Sylvia Daniel told you that.
20 Now, the other thing that Judge Cole's
21 order says about each IEP meeting is that
22 members of the AIDB would be invited to
23 that meeting. Do you remember that?

Page 446

1      A.  Can we go back to that, please?
2      Q.  To the order?
3      A.  Uh-huh.
4      Q.  Sure.
5          MR. CASSADY: Your Honor, if it's
6  okay, I'll just go ahead and mark a copy of
7  your order. The next one is 22?
8          HEARING OFFICER: 22. Any
9  objection to Petitioner's Exhibit Number 21
10 that was previously identified and
11 discussed? Did we do 21?
12         MR. CASSADY: I'm not sure. I
13 think the minutes were last and they're
14 Number 20. So this will be 21.
15         HEARING OFFICER: Okay. Any
16 objection to Petitioner's Exhibit Number
17 21?
18         MS. TATUM: Is 21 the mediation
19 settlement agreement.
20         MR. CASSADY: It is the order and
21 judgment of Judge Cole.
22         MS. TATUM: That's what I'm trying
23 to figure out, which pages that you're

15 (Pages 443 - 446)

Page 447

1 introducing.
2          MR. CASSADY: I'll show it to you.
3          MS. TATUM: Does it start with
4 order and judgment?
5          MR. CASSADY: Please have a look.
6 I'll represent to the Court that that is
7 your order and judgment.
8          MS. TATUM: And also a letter. I
9 don't have any objection.
10         HEARING OFFICER: No objection
11 being made, Petitioner's Exhibit Number 21
12 is admitted into evidence.
13         MR. CASSADY: She means your April
14 5th letter, cover letter with the judgment.
15         HEARING OFFICER: Right.
16         MS. TATUM: No objection.
17   Q.   Now, let me hand you this copy.
18         MR. CASSADY: May I approach, Your
19 Honor?
20         HEARING OFFICER: Sure.
21   Q.   In paragraph three of Judge
22 Cole's judgment, it says, quote, quote, second
23 sentence, quote, The, all caps, AIDB, end

Page 448

1 all caps, outreach professionals shall be
2 invited to attend the IEP meetings once
3 every quarter of the school year in person
4 or by phone, comma, and their time and
5 mileage shall be compensated by the, all
6 caps, LEA, period, end quotation marks.
7 Have the AIDB professionals ever been
8 invited to any of these IEP meetings?
9          MS. TATUM: Objection. It's been
10 asked and answered. It was asked and
11 answered.
12         HEARING OFFICER: Sustained.
13   Q.   Were they invited to this
14 meeting?
15   A.   To this meeting today?
16   A.   No, ma'am. To the August 27,
17 2018 IEP meeting.
18   A.   No, because we had an interpreter
19 in place.
20   Q.   Okay. And the interpreter was
21 not there either, right?
22   A.   But we had an interpreter in
23 place.

Page 449

1   Q.   Okay. Now, was this an emergency
2 IEP meeting on August 27, 2018?
3   A.   It was an IEP meeting that was
4 scheduled. That would have to come from
5 the case manager. He was exhibiting
6 aggressive and violent behaviors.
7   Q.   What is the difference in an
8 emergency IEP meeting and just an IEP
9 meeting?
10  A.   An IEP meeting is an IEP.
11  Q.   What's an emergency IEP meeting?
12  A.   They're all IEP meetings.
13  Q.   After August 27, 2018, when was
14 the next IEP meeting?
15  A.   That would have been August 31st.
16  Q.   And so Monday is the 27th. So
17 Tuesday is the 28th. Wednesday is the
18 29th. Thursday is the 30th, and then we're
19 having another IEP meeting on August 31.
20 Why had this August 31 IEP meeting been
21 called?
22  A.   It says coming from page seven
23 sixty-two the IEP team met to discuss

Page 450

1 recent behavior episodes and safety.
2   Q.   Thank you. Where is the notice
3 to Ms. ████ for this meeting?
4          MS. TATUM: Mr. Hearing Officer,
5 this was one of the notices that
6 Ms. McElrath was asked to go to her office
7 and print. The notices are up here.
8 They're not in the book.
9          HEARING OFFICER: Do you have
10 those?
11         MS. TATUM: We're talking about
12 for the August 31st.
13         THE WITNESS: Oh, I don't have it.
14         HEARING OFFICER: So we'll give
15 that to Mr. Cassady, a copy.
16  Q.   Do you have your copy in front of
17 you, ma'am?
18  A.   Yes.
19  Q.   Okay. So this -- what was the --
20 this is an August 31, 2018 IEP meeting.
21 What date was this notice sent according to
22 your paperwork to Ms. ████
23  A.   August 30th.

16 (Pages 447 - 450)

Page 451

1   Q.   And is there anything in your
2 record that would indicate what time during
3 the day this notice went to Ms. ███?
4   A.   I don't see a time on it.
5   Q.   Is there anything in your records
6 that would disclose to you the time that
7 this notice was sent to Ms. ███ for an
8 IEP meeting the next morning at eight a.m.?
9   A.   I wouldn't know when it was sent.
10 I can continue to look through the records.
11 But I don't know.
12   Q.   Is this the date -- did you have
13 a conversation with a Montgomery police
14 officer about going to see Ms. ███ at
15 work?
16   A.   I did not.
17   Q.   Have you ever heard of that?
18   A.   That what?
19   Q.   Have you ever heard that this
20 district sent a Montgomery police officer
21 to Ms. ███ place of employment while
22 she was working?
23   A.   I don't know of Millbrook Middle

Page 452

1 or anyone sending a police officer.
2   Q.   Well, you put emphasis, if I may,
3 on the word sending. Are you aware, do you
4 have any knowledge of a police officer
5 going to Ms. ███ place of employment
6 to communicate to her something related to
7 ███ being in school?
8   A.   Yes.
9   Q.   What do you know about that?
10   A.   That's all I know.
11   Q.   How do you know about that?
12   A.   Because when I -- let me make
13 sure. It had to be -- I don't know the
14 actual date when I knew that a police
15 officer had been to her job. I don't know
16 if I -- I don't know the exact date. I
17 knew the date of the incident that they
18 were trying to make contact with her. They
19 weren't successful. But I don't know if
20 that's when I knew or not. It could have
21 been. I don't know. It could have been.
22   Q.   How did you learn that a
23 Montgomery police officer had been sent to

Page 453

1 Ms. ███ place of employment?
2   A.   I don't know who actually told me
3 that someone had been to her place of
4 employment. I don't remember.
5   Q.   What records would you look at to
6 investigate the question of how you learned
7 that a Montgomery police officer had been
8 sent to Ms. ███ place of employment?
9   A.   I don't have any records.
10   Q.   Did you ever discuss that with
11 anyone else that the Montgomery police had
12 been to Ms. ███ place of employment?
13   A.   Not that I can remember.
14   Q.   Did you ever discuss it with
15 Ms. ███?
16   A.   I don't remember.
17   Q.   And do you know why the
18 Montgomery police were sent to Ms. ███
19 place of employment?
20   A.   I do not know.
21   Q.   I've marked as Exhibit Number 22
22 a notice invitation to a meeting that says
23 date notice sent August 30, 2018 for an IEP

Page 454

1 meeting the next morning on August 31,
2 2018. Now, what does it say on results of
3 first attempt, first attempt to contact the
4 parent with the IEP team meeting?
5   A.   August -- for the notice for the
6 August 31st meeting?
7   Q.   Yes, ma'am.
8   A.   The first attempt, notice sent
9 home. Phone call and text. No response.
10   Q.   How was a notice sent home to
11 Ms. ███ on August 30th, 2018?
12   A.   I don't know.
13   Q.   Do you have any reason to believe
14 that someone personally drove it out there
15 to her house?
16   A.   Well, ███ was on campus on the
17 30th. So I don't know.
18   Q.   Do you have any reason to believe
19 that it was put in his backpack or
20 something like that?
21   A.   Could have been. I don't know
22 how it was given to her.
23   Q.   Who would know?

17 (Pages 451 - 454)

Page 455

1   A.   The teacher.  The case manager.
2   Q.   And who is that?
3   A.   Ms. Perry, Tina Perry.
4   Q.   And then it says phone call and
5 text.  Who texted Ms. ███?
6   A.   I don't know.
7   Q.   How would you find out?
8   A.   I would have to ask.
9   Q.   Who would you ask?
10   A.   The case manager.
11   Q.   Who is that?
12   A.   Ms. Perry.
13   Q.   And, now, it says the second
14 attempt was made on August 31, 2018.  That
15 is the date of the IEP meeting?
16   A.   Uh-huh.
17   Q.   Correct?
18   A.   Correct.
19   Q.   And you are aware as the special
20 education coordinator that more than one
21 attempt must be made to notify the parents
22 of an IEP meeting.  You know that?
23   A.   Yes.

Page 456

1   Q.   And you know that the reason for
2 that is because parents are often working
3 themselves and that the date may not be
4 convenient for them.  Do you understand?
5   A.   I understand.
6   Q.   And then it says what -- what was
7 the second attempt made to try to notify
8 Ms. ███ of the second -- first, what was
9 the date of the second attempt?
10   A.   August 31st.
11   Q.   And the IEP meeting was to begin
12 that morning at eight a.m.?
13   A.   Yes.
14   Q.   And it says what?  How was the
15 second attempt made on August 31 with the
16 IEP meeting to begin that morning at
17 eight a.m.?
18   A.   Phone call.  No response.  Parent
19 did not attend meeting.
20   Q.   Does that mean that -- well, so
21 who called her?
22   A.   I don't know.
23   Q.   How would you find out?

Page 457

1   A.   I'd have to ask the case manager.
2   Q.   And that's Sylvia Daniel?
3   A.   No.  Ms. Perry.
4   Q.   Did ███ come to school, come
5 that day on August 31, 2018?
6   A.   I don't know.  I don't know.
7      MR. CASSADY:  Your Honor, we would
8 move to admit the notice which is
9 Plaintiff's Exhibit 22.
10      HEARING OFFICER:  Any objection?
11      MS. TATUM:  Which notice is that,
12 the August 31?
13      MR. CASSADY:  Yes.
14      MS. TATUM:  No objection.
15      HEARING OFFICER:  No objection
16 being made, Plaintiff's Exhibit Number 22
17 is admitted into evidence.
18   Q.   So you have no personal knowledge
19 of any notice being sent to Ms. ███ for
20 any of these IEP meetings because -- and
21 we're talking about the ones in August.
22 There were three.  You don't have any
23 knowledge of that because you did not do it

Page 458

1 personally yourself, right?
2   A.   I have no knowledge of who sent
3 them, but the record indicates they were
4 sent.
5   Q.   Well --
6   A.   Communication is made with the
7 parent.
8   Q.   You printed these out from your
9 computer yesterday for the August 27, 2018
10 and the August 31, 2018 meetings.  You went
11 into your computer yesterday and printed
12 out these notices of the IEP meetings,
13 right?
14   A.   Right.
15   Q.   And did your computer, when you
16 -- when you pulled that up, did it have a
17 record that someone -- is a record that
18 that someone sent it or how it was
19 transmitted?
20   A.   I didn't look for that.  In the
21 time I had, I went and printed it.  I
22 didn't know all of those things.
23   Q.   You say you did not look for it.

18 (Pages 455 - 458)

Page 459

1  Is there a way in your computer to tell who
2  sent the notices for the August 20, August
3  27, and August 31 IEP meetings?
4      A.   Who created the document. It
5  would show who was in there at a certain
6  time in that child's file.
7      Q.   So it would show when that
8  document was created?
9      A.   It would show an audit
10 trail of who has been in that child's
11 folder.
12     Q.   And do you know how to print it
13 from your screen?
14     A.   I can try.
15     Q.   And do you know how to print the
16 audit trail?
17     A.   I will do my best.
18     Q.   And is that computer here at this
19 physical facility we're at today?
20     A.   I have a computer.
21     Q.   All right. And so you said that
22 it will have an audit trail. What is in
23 the audit trail?

Page 460

1      A.   Just showing who has been in and
2  out of the file.
3      Q.   And the date and time they were
4  in it?
5      A.   I'd have to look and see. I
6  can't really tell you exactly what all is
7  included or what it actually says. I'd
8  have to go back and look.
9      Q.   Does it state when the -- does it
10 state who sent the notice?
11     A.   No.
12     Q.   Okay. So the minutes which are
13 document seven sixty-two for the August 31,
14 2018 IEP meeting, are you at that document,
15 please, ma'am?
16     A.   Yes.
17     Q.   And it says that Paula Strong,
18 the interpreter, was invited to this
19 meeting. Do you see that?
20     A.   Yes.
21     Q.   And do you know why she was
22 invited?
23     A.   I do not.

Page 461

1      Q.   Do you know whose handwriting
2  this is?
3      A.   I do not.
4      Q.   You were not present at this IEP
5  meeting?
6      A.   It doesn't say I was. I don't
7  see my name on it. No.
8      Q.   Do you know what the last day of
9  school was that ████ attended Millbrook
10 Middle School?
11     A.   I do not.
12     Q.   Do you know how we would find a
13 record of that?
14     A.   It would just be his attendance.
15     MR. CASSADY:  23.
16     MS. TATUM:  Oh, that's fine. I
17 have no objection.
18     HEARING OFFICER:  Plaintiff's
19 Exhibit Number 23 is admitted without
20 objection.
21     MR. CASSADY:  These are the
22 meeting minutes, Your Honor, for the August
23 31, 2018 meeting.

Page 462

1      Q.   Okay. It says under discussion,
2  quote, The IEP team met to discuss recent
3  continued behavior episodes and safety, end
4  quote. What recent behavior had occurred
5  between the August 31, 2018 IEP meeting --
6  I'm sorry. Yes -- and the August 27, 2018
7  IEP meeting? We're talking about a week
8  since the August 27, 2018 IEP meeting.
9  What was the recent behavior in that week?
10     A.   On page seven sixty-two, it reads
11 at the very bottom starting with, ████ has
12 continued to have behaviors of aggression,
13 physical and verbal, toward people and
14 property. In review, the IEP team
15 previously met on 8/20 and 8/27 with Mom
16 present, physically 8/20 and by phone on
17 8/27 to discuss concerns for ████
18 behavior. The team has been concerned for
19 ████ safety and the safety of others.
20     Q.   Are you able to identify for
21 Judge Cole any specific?
22     A.   That was seven sixty-three. I'm
23 sorry, sir. I need to give the page.

19 (Pages 459 - 462)

1 Seven sixty-three.
2    Q.   Are you able to identify to Judge
3 Cole any specific incidence of conduct that
4 ██████ engaged in during the time period
5 between the August 27, 2018 IEP and the
6 August 31, 2018 IEP meeting?
7    A.   Yes. Give me a second.
8       MS. TATUM: Mr. Hearing Officer,
9 may I be permitted to direct Ms. McElrath
10 to page numbers?
11      HEARING OFFICER: Sure.
12      MS. TATUM: In the white notebook,
13 that's where you are.
14      THE WITNESS: Go ahead.
15      MS. TATUM: In the white notebook.
16 In the white notebook there's a table of
17 contents, and it may provide assistance as
18 far as documents that you're looking for.
19      THE WITNESS: Okay.
20    A.   Okay.
21    Q.   What document are you looking at
22 now?
23    A.   In Tab 13, Exhibit 13 of this

1 notebook, there's an office referral for
2 8/28/18.
3    Q.   Are there any other documents? I
4 first want to identify the documents that
5 have specific incidences of conduct that
6 occurred between the August 27, 2018 IEP
7 meeting and the August 31, 2018 IEP
8 meeting. And we'll talk about the
9 documents, but I want to identify them
10 first. Okay. You're at tab?
11    A.   13.
12    Q.   13. Are there any others?
13    A.   Yes. Tab 14.
14    Q.   Okay. Any others?
15    A.   Seven forty and seven forty-one,
16 seven forty-two, seven forty-three, seven
17 forty-four, seven forty-five.
18    Q.   Are there any documents other
19 than what you've identified as Tabs 13 and
20 14 and then educational records seven forty
21 through seven forty-five that contain
22 specific incidences of conduct by ████
23 between the IEP meeting on August 27, 2018

1 and the IEP meeting on August 31, 2018?
2    A.   Not to my knowledge.
3    Q.   Have you read these documents
4 before that you've just identified?
5    A.   No.
6    Q.   You've never read them before
7 today?
8    A.   Only the seven -- the seven forty
9 to seven forty-five, the restraint forms.
10 A copy comes to our office.
11    Q.   First I'd like -- I've marked as
12 23 --
13      MR. CASSADY: Is 23 in, Your
14 Honor? It's the IEP meeting she has no
15 objection to.
16      HEARING OFFICER: Yes. It's in.
17    Q.   Now, I do want to go back to
18 these meeting minutes if you have these for
19 a minute which are 23.
20    A.   Is that August 27?
21    Q.   August 31, 2018.
22    A.   Okay.
23    Q.   Okay. Do you see in the -- on

1 the first paragraph it says, quote, The IEP
2 team met to discuss recent continued
3 behavior episodes and safety. ████
4 mother, Ms. ██████ was invited to the
5 meeting but did not respond. And then it
6 says parenthesis, Ms. ██████ was given a
7 written invitation, phone messages and text
8 message. ██████ uncle who picked him up
9 8/30 which is the day before was also told
10 about the meeting in order to tell
11 Ms. ██████ close parenthesis. Then it
12 says, quote, Team members were introduced
13 and Ms. ██████ was called by the special ed
14 teacher with no answer. Meeting purpose
15 was stated, end quote. So now the meeting
16 begins, right?
17    A.   Yes.
18    Q.   According to your documentation?
19    A.   Yes.
20    Q.   So the meeting has started at
21 eight o'clock. The second attempt to
22 notify Ms. ██████ has been that they called
23 her I guess a few minutes before eight

20 (Pages 463 - 466)

Page 467

1 o'clock and she did not answer. So that
2 was the second attempt to give her notice,
3 right?
4    A.   I don't know what happened prior
5 to.
6    Q.   Okay. Well, but you know from
7 the form we've just been over which is
8 required by IDEA that her second invitation
9 to the August 31, 2018 IEP meeting was on
10 the morning of August 31, 2018?
11    A.   According to the document, yes.
12    Q.   Right. And you know from these
13 meeting minutes that someone tried to call
14 her. When the IEP team met to discuss
15 recent continued behavior and then it says
16 Ms. ███████ was called, right?
17    A.   Yes.
18    Q.   Okay. Now, are you aware of any
19 special education regulation or anything
20 in -- that -- for instance, the Alabama
21 Special Education Department publishes all
22 sorts of materials on complying with
23 special education law, right?

Page 468

1    A.   Yes.
2    Q.   And it's on their website and
3 anybody that wants to look at it can,
4 right?
5    A.   Yes.
6    Q.   For instance, there's a whole
7 series called mastering the maze. Have you
8 ever seen those?
9    A.   Yes.
10    Q.   Okay. And are you familiar with
11 any authority of any type for the Alabama
12 Department of Special Education, in their
13 website, anything that's been published or
14 anything like that that says that the
15 second attempt to notify a parent of an IEP
16 meeting can be made when the IEP meeting
17 starts?
18    A.   It doesn't indicate. It's just
19 second attempt. And we have to indicate
20 what that second attempt was.
21    Q.   Okay. So have you -- have you
22 ever looked to see what reasonable advance
23 notice is with respect to a notice to a

Page 469

1 parent?
2    A.   Looked where?
3    Q.   Anywhere.
4    A.   No.
5    Q.   All right. Now, so I've marked
6 as Plaintiff's Exhibit 24 that she tabs out
7 that she identified. I want to hand these
8 to opposing counsel so she can take a look
9 if she wants to.
10       MS. TATUM:  Are they Respondent's
11 Exhibit 13 and 14?
12       MR. CASSADY:  Well, this is
13 currently -- yes. They were from that, but
14 this is now my Exhibit 24.
15       MS. TATUM:  No objection.
16       MR. CASSADY:  And then also these
17 are documents seven forty through seven
18 forty-five which she identified just a
19 moment ago as Plaintiff's Exhibit 25.
20       MS. TATUM:  No objection.
21       HEARING OFFICER:  No objection
22 being made, Petitioner's Exhibit Number 24
23 and Petitioner's Exhibit Number 25 are

Page 470

1 admitted into evidence.
2       MS. TATUM:  Mr. Hearing Officer,
3 since Mr. Cassady is not giving me any
4 copies of the exhibits, on a break can I
5 have someone make copies of the exhibits?
6       HEARING OFFICER:  Sure.
7 Absolutely.
8       MR. CASSADY:  The records we've
9 identified has the Bates stamp number and
10 it's readily available if someone wants to
11 look.
12    Q.   Would you turn to Tab 13, please.
13 Now, do you know who's signature this is at
14 the bottom of this page which says Elmore
15 County Schools office referral? It's dated
16 August 28, 2018.
17    A.   Whose --
18    Q.   Do you know whose signature that
19 is?
20    A.   It's the administrator.
21    Q.   Do you know whose handwriting it
22 is in the top? It's a printed handwriting
23 where it describes the offense.

21 (Pages 467 - 470)

Page 471

1    A.   I do not know who printed it.
2    Q.   Okay.  It says signature,
3  doesn't -- of employee.  Does that say Tina
4  Perry?
5    A.   It does.
6    Q.   And it says, quote, Hit Ms. Perry
7  8/28 on back of shoulder in classroom.  Ten
8  thirty-eight a.m.  A.W., for ████ ████
9  hit Ms. Chambliss on back in cafeteria and
10 kicked her about five times, end quote.
11 Did I read that correctly?
12   A.   Yes.
13   Q.   And down in the administrative
14 use only it's circled intentional contact
15 of board employee by student.  First, have
16 you ever seen a videotape of this?
17   A.   No.
18   Q.   Have you ever seen any videotape
19 of ████ ████
20   A.   Not to my knowledge.
21   Q.   And was the -- was the full-time
22 interpreter with ████ ████ at the time he
23 did this?

Page 472

1    A.   She should have been.  She was
2  assigned to that school.  She had no other
3  duty but to be there for him.  So where she
4  was at the time of this incident I wouldn't
5  know because I wasn't there.
6    Q.   And is there anything on this
7  page that we're looking at that describes
8  conduct that ████ had not engaged in
9  before Judge Cole's order of April 5, 2018?
10   A.   Anything on this?
11   Q.   Yes.  It says he hit a teacher
12 and he kicked a teacher.  Had he done that
13 before August -- before Judge Cole's order
14 of April 5, 2005?
15   A.   He had hit teachers and people
16 before.
17   Q.   And he had hit people before?
18   A.   Yes.
19   Q.   If you would turn to the next
20 page, please.  This says Elmore County
21 Schools restraint form.  8/28/2018.  And it
22 describes behaviors and it says, quote,
23 A.W. hit Ms. Chambliss on the back and

Page 473

1  kicked her about five times in the
2  cafeteria, end quote.  Then it says,
3  Describe what you explained to the child
4  about behaviors prior to end of restraint.
5  Quote, ████ was asked to calm down.  A.W.
6  calmed down and nodded yes.  Now, it says
7  the staff performing the restraint was Tina
8  Perry, doesn't it?
9    A.   Yes.
10   Q.   And it says the staff observing
11 restraint was Ms. Chambliss and Jo Ann
12 Adams?
13   A.   Yes.
14   Q.   Who is Ms. Chambliss?
15   A.   Special ed teacher.
16   Q.   Who is Jo Ann Adams?
17   A.   Paraprofessional.
18   Q.   Then there's no indication that
19 the interpreter was present, correct?
20   A.   It doesn't mean she wasn't,
21 though.  It just doesn't indicate.
22   Q.   Well, whoever filled out this
23 form was supposed to name the staff

Page 474

1  observing the restraint.  Do you agree with
2  that?
3    A.   Yes.
4    Q.   Now, then it says, Name of family
5  guardian notified.  Twelve p.m. Mom still
6  at work.  Called, message left.  No
7  response.  And it also says an uncle.  Can
8  you tell me his name?  Is that Broadneck?
9    A.   I don't know.
10   Q.   Now, this also described conduct
11 which ████ had engaged in many times
12 before Judge Cole's order of April 5, 2018,
13 true?
14   A.   Very similar behaviors.
15   Q.   Are you able to identify any way
16 that they're different?
17   A.   I wasn't there.  So I don't know
18 the --
19   Q.   And then the next page is another
20 referral form dated 8/30.  And have you
21 turned to that yet?
22   A.   Are you on 14?
23   Q.   Yes, ma'am.

22 (Pages 471 - 474)

Page 475

1    A.    Yes.
2    Q.    Okay.  This is Plaintiff's
3 Exhibit 24, Tab 14.  It says description of
4 offense, 8/30/18, eleven 0 eight a.m.
5 ██████ ████ got yard stick, tried to hit
6 Ms. Perry and threw computer on the floor.
7 Administrator called eleven eighteen.  A.W.
8 hit and bit Mr. Kreauter?
9    A.    Kreauter.
10    Q.    Mr. Kreauter restrained A.W.  Can
11 you read the rest of it?
12    A.    A.W. kicked nurse.
13    Q.    Then it says?
14    A.    Ran out of room at eleven
15 eighteen.  It says A.W. kicked nurse eleven
16 eighteen.  Eleven thirty-one, ran out of
17 room.  Do you want me to continue?
18    Q.    Please, ma'am.
19    A.    Hit principal in face multiple
20 times.  Injured and assaulted custodian,
21 eleven thirty-three.
22    Q.    Now, that was written by Tina
23 Perry?

Page 476

1    A.    Yes.  Well, she signed it.
2    Q.    Now, the next page is -- this
3 resulted in restraint, correct?
4    A.    There's a restraint form for this
5 one.
6    Q.    Yes.  That's the next page?
7    A.    Yes.
8    Q.    And the staff observing the
9 restraint are Ms. Jackson.  Who is that?
10    A.    That's the principal.
11    Q.    Custodian Mr. Bernard.  Mr. --
12    A.    Kreauter.
13    Q.    -- Kreauter.  Kreauter.  And tell
14 me his position again.
15    A.    Assistant principal.
16    Q.    And Paula Strong?
17    A.    Yes.
18    Q.    And what is her position?
19    A.    Interpreter.
20    Q.    And so, again, the -- the sign
21 language interpreter or the interpreter
22 that Judge Cole ordered would be with him
23 at all times on April 5 of 2018 is not

Page 477

1 listed on this form on August 30, 2018, of
2 restraint, is she, as a staff observer?
3 She's not listed, is she?
4    A.    August 30, she's listed.  Staff
5 observe restraint.
6    Q.    Is she listed?
7    A.    On August 30 I see her name,
8 staff observed restraint.
9    Q.    What's her name?
10    A.    Paula Strong.
11    Q.    She's the interpreter?
12    A.    Yes.
13    Q.    Okay.  All right.  All right.
14 Now, that would indicate that she was not
15 with him the day before, wouldn't it?  Or
16 the day of the last restraint form we read
17 was at Tab 13.  And the observers were
18 Ms. Chambliss and Jo Ann Adams and
19 Ms. Strong is nowhere mentioned.  So that
20 would indicate she was not there on August
21 28, 2018?
22    A.    It would indicate that she may
23 have been at a break.  She has to take a

Page 478

1 break to use the restroom.  I don't know
2 what was occurring at that time, but she
3 was assigned to ████ and ████ only the
4 entire time.
5    Q.    You agree that you're speculating
6 that she might have been on a break, aren't
7 you?
8    A.    I am -- I know that she was on
9 her duty as being the interpreter for him.
10 Where she was at the time this incident
11 occurred I do not know.
12    Q.    Okay.
13    A.    But she was on campus.
14    Q.    You're saying she was on campus
15 on both of these dates?
16    A.    Unless she had an absence put in
17 that she was going to be out, she would
18 have been on that campus for ████  She
19 was assigned only to ████
20    Q.    All right.  And is there any
21 conduct that we've reviewed in Plaintiff's
22 Exhibit 24 which are Tabs 13 and 14 out of
23 the white binder, is there any conduct

23 (Pages 475 - 478)

Page 479

1  we've reviewed in this that ███ had not
2  engaged in before Judge Cole's order of
3  April 5, 2018?
4     A.   I don't know.
5     Q.   Okay. Thank you. Now, the next
6  exhibit I'd like to ask you about would be
7  document seven forty in the educational
8  records binder which is Plaintiff's Exhibit
9  25.
10    A.   Can we take a break?
11        HEARING OFFICER: Yes, ma'am.
12 Let's take a mid morning break. She needs
13 a break. And let's make it ten minutes.
14        (Brief recess)
15        HEARING OFFICER: Okay. We'll go
16 back on the record and continue with
17 examination by Mr. Cassady.
18        MR. CASSADY: Yes, sir. Thank
19 you.
20    Q.   Now, up until the August 27, 2018
21 IEP meeting where ███ was put on
22 homebound at home, coming to school one
23 hour a day, Ms. ███ had participated in

Page 480

1  all of the IEP meetings, hadn't she?
2     A.   I believe so.
3     Q.   Okay. But when ███ was put
4  back on homebound at home with one hour of
5  school a day as a result of the August 27,
6  2018 IEP, her cooperation ended; is that
7  correct?
8     A.   I'd have to go and look at the
9  meetings to know.
10    Q.   Well, is it your -- is it going
11 to be your testimony -- is it your
12 testimony that Ms. ███ cooperation
13 ended?
14    A.   In IEP meetings? I'd have to
15 look at the signature page. Did her
16 communication end with us trying to provide
17 services? Yes.
18    Q.   Okay. And when did it end?
19    A.   We made contact throughout.
20 We've been trying to make contact with her
21 since the 31st.
22    Q.   August 31, 2018?
23    A.   Uh-huh.

Page 481

1     Q.   If you would, say yes.
2     A.   Yes. Uh-huh.
3     Q.   Now, you had been through a
4  previous due process hearing with
5  Ms. ███ that was because ███ had
6  put -- been put on homebound at home and
7  that resulted in Judge Cole's order of
8  April 5, 2018. Do you agree?
9     A.   We had been through a mediation
10 agreement. I don't recall all the facts
11 that led us to that.
12    Q.   Well, I'll represent to you that
13 there was an order and judgment. But you
14 remember that that prior order and judgment
15 had been -- was entered and it very much
16 concerned whether or not ███ should be on
17 homebound at home or not. Do you remember
18 that?
19    A.   There were a number of things in
20 that agreement, but that was one of them,
21 about homebound was addressed in that
22 agreement.
23    Q.   Right. And then Ms. -- after

Page 482

1  that order and judgment of Judge Cole
2  returning him to the public school system
3  for a full day, after that order and
4  judgment was entered, she cooperated from
5  April 5, 2018 all the way up until August
6  31, 2018 when he was put back on homebound
7  at home except for one hour a day. Would
8  you agree with that?
9     A.   I don't know if she -- if she
10 actually cooperated throughout. Did she
11 attend IEP meetings or via phone or in
12 person, yes. But day-to-day communication
13 with the parent, I don't know.
14    Q.   Well, based on your review of the
15 special education file to date, would you
16 say that it is true that Ms. ███
17 cooperated with the district from the date
18 of April 5, 2018, the date of Judge Cole's
19 judgment, up until August 31, 2018 when
20 ███ was put on homebound at home again
21 except that he was going to come to school
22 one hour a day?
23    A.   No.

24 (Pages 479 - 482)



Page 483

1   Q.   Actually it was August 27, 2018?
2   A.   No.
3   Q.   Okay.
4   A.   I will not say that she
5   cooperated fully. Did she participate in
6   the IEP meetings? Yes. But to fully
7   cooperate and communicate, no.
8   Q.   Please identify to Judge Cole
9   each incidence of non-cooperation by
10   Ms. ████ between his judgment date of
11   April 5, 2018 and August 27, 2018 when
12   he -- when ████ was put back on homebound
13   except for one hour -- homebound at home
14   except for one hour per day?
15   A.   That would have to come from the
16   instructor and the base schools.
17       HEARING OFFICER: I think her
18   issue is that she -- she can say her
19   personal knowledge but she can't speak
20   for --
21       MR. CASSADY: I understand.
22   Q.   Is it fair to say that as the
23   judge just characterized it, that you on

Page 484

1   your personal knowledge and your review of
2   the file, you're not aware of any
3   incidences of her non-cooperation yourself
4   between his judgment of April 5, 2018 and
5   the August 27, 2018 IEP when ████ was put
6   back on homebound at home coming to school
7   for one hour per day?
8   A.   I do know that the parent was not
9   always cooperative nor was she always fully
10   available, made herself available. Those
11   specifics I do not have date and time when
12   contact was made. But generally, I do know
13   that she was not fully cooperative
14   except for IEP meetings.
15   Q.   Can you identify a single
16   specific incidence of conduct between April
17   5, 2018 when Judge Cole's order was entered
18   and August 27, 2018 when ████ was put by
19   the IEP team back on homebound at home
20   except for one hour a day at school, can
21   you identify a specific incidence of
22   conduct that you either personally
23   witnessed or that you've read about in the

Page 485

1   file?
2   A.   Only when she did not make
3   contact on the 27th. She could not be
4   reached. I don't have any more
5   documentation.
6   Q.   Or personal knowledge?
7   A.   I don't have any more
8   documentation.
9   Q.   But do you have personal
10   knowledge with your eyes or own ears of
11   communicating with her yourself between
12   those two dates that she didn't cooperate?
13   A.   I know that we had a struggle
14   with her for her to communicate with us,
15   but I don't have specifics nor do I have
16   any records to support that.
17   Q.   Okay.
18   A.   Okay.
19   Q.   Thank you. Now, the IEP meeting
20   minutes of the August 31, 2018 meeting --
21   A.   Say that date again, sir.
22   Q.   Yes, ma'am. August 31, 2018.
23   And these are the minutes which have been

Page 486

1   marked as Plaintiff's Exhibit 23. And I
2   would direct you to the second page in the
3   middle of this first paragraph. I'm going
4   to read where it says, quote -- this is the
5   fourth line down. Quote, The team has been
6   concerned for ████ safety and the safety
7   of others. At the 8/27 meeting, the team
8   reviewed options and decided that, quote,
9   partial, end quote, homebound option would
10   be best for ████ would attend
11   school, parenthesis, arriving by bus, close
12   parenthesis, in the morning and picked up
13   by his mother, forward slash, family at
14   nine thirty, parenthesis, homebound speech
15   therapy and academics would be provided at
16   school during the morning, close
17   parenthesis. Did I read that correctly?
18   A.   Yes.
19   Q.   And, now, the district understood
20   when Judge -- when the first due process
21   was filed that the mother is a single
22   mother who works managing a hotel and that
23   she did not agree with any IEP or any

25 (Pages 483 - 486)

Page 487

1 homebound program where ███ did not
2 attend a full day of school. That was
3 known all along before Judge Cole entered
4 his order of April 5, 2018, true?
5    A.   True.
6    Q.   Okay. And so now in these August
7 31, 2018 IEP minutes, the document, it's
8 stating that the team -- this is -- the
9 mother is not present -- has discussed the
10 mother having to pick him up every morning
11 at nine thirty a.m. at the school, correct?
12    A.   Yes.
13    Q.   And it was known to the IEP team
14 that she did not agree with that, true?
15    A.   True. But services are afforded
16 to the child, not the parent. We have to
17 do what is best for him. So the things
18 that we were deciding were based on what
19 ███ needs were at that time.
20    Q.   Okay. And, now, what was your
21 analysis to reach the conclusion you just
22 said that that was best for ███ How was
23 that -- how did you arrive -- you just made

Page 488

1 that as a declarative statement. What is
2 your analysis that leads you to that
3 conclusion that that was best for ███
4    A.   It wasn't just my conclusion. I
5 said the IEP team had to make a decision.
6    Q.   What was your contribution to
7 that discussion?
8    A.   I don't remember the details.
9    Q.   Well, and that's because you
10 weren't there, right?
11    A.   I don't remember. I may not have
12 been at this one. You've given me several
13 meetings. So I would have to look back and
14 see.
15    Q.   This is one where you were not
16 present.
17    A.   Okay. Well, I was not present,
18 then. So I did not have any input.
19    Q.   So you don't know what they
20 discussed, right?
21    A.   Well, you and I both have a
22 snapshot of what they discussed by the
23 minutes.

Page 489

1    Q.   But you say that it was in his
2 best -- do you have an opinion -- as the
3 special education coordinator, do you have
4 an opinion, yes or no, on whether or not it
5 was in -- of why it was, quote, best, end
6 quote, for ███ to go to school for one
7 hour until nine thirty each morning instead
8 of being at school all day? Do you have an
9 opinion?
10    A.   I don't have an opinion. I just
11 have the notes supported by the IEP team.
12    Q.   Okay. Thank you. And then it
13 says, quote, Transportation reimbursement
14 was offered by special education versus
15 homebound and was scheduled to start 8/29,
16 end quote. What transportation
17 reimbursement was offered, if you know?
18    A.   I wasn't there.
19    Q.   Then it says, quote, ███ was
20 picked up on the 29th as discussed and then
21 had behaviors that escalated to, for
22 instance, hitting, kicking and biting,
23 close parenthesis, aggression toward six

Page 490

1 different adults, staff while at school.
2 ███ was eventually picked up by his
3 uncle. His mother was contacted multiple
4 times. Now, this is after the school
5 district had put him back on homebound,
6 true?
7    A.   Based on this, yes.
8    Q.   Homebound at home, correct?
9    A.   Well, partial.
10    Q.   And you remember testifying
11 yesterday that it was not appropriate for
12 ███ -- that you did not believe it was
13 appropriate for ███ to be at home alone
14 from nine thirty a.m. until late in the
15 afternoon. Do you remember saying that
16 yesterday?
17    A.   I know it's not appropriate for a
18 child to be left home alone.
19    Q.   So then you do understand that it
20 is the school district's obligation to
21 educate this child and provide a free and
22 appropriate education, right?
23    A.   But the mother is a part of the

26 (Pages 487 - 490)

1 IEP team. But yes. Yes.
2   Q.   Do you --
3   A.   Yes.
4   Q.   I want the record to be clear.
5 Do you understand that it is the school
6 district's obligation and the school
7 district's obligation alone to provide FAPE
8 which is a free and appropriate education
9 to the student?
10   A.   Public education to ▮▮▮▮▮
11   Q.   Is that a yes?
12   A.   Yes.
13   Q.   All right. Now --
14   A.   But may I say that even though we
15 are to provide FAPE, we can't provide if
16 the child is not produced by the parent.
17 We have to have cooperation and
18 communication with the parent in order for
19 FAPE to be provided. I can't go into her
20 home without her allowing me there, even in
21 attempting to provide FAPE.
22   Q.   Let me show you Judge Cole's
23 order and judgment.

1       MR. CASSADY:   And, Your Honor,
2 under the --
3   Q.   Do you have his order and
4 judgment with you?
5       HEARING OFFICER:   She does.
6   A.   Yes.
7   Q.   Where does Judge Cole's judgment
8 of April 5, 2018 say that the child will be
9 delivered by the mother to the school?
10   A.   Well, it doesn't say anything
11 about her being a single mom either and
12 that we have to make accommodations because
13 she's a single mom and she works.
14       MR. CASSADY:   We would ask that
15 Your Honor direct the witness to not be
16 aggressive in response and answer the
17 questions.
18       MS. TATUM:   I'm going to object.
19 She wasn't aggressive.
20       HEARING OFFICER:   She may have
21 been non-responsive, but she wasn't
22 aggressive.
23       MR. CASSADY:   Well, it's all a

1 matter of how that word is interpreted.
2       HEARING OFFICER:   I understand.
3   Q.   Would you please answer the
4 question?
5   A.   Can you repeat your question?
6   Q.   How does Judge Cole's order of
7 April 5, 2018 anticipate that the child
8 would be delivered to the school?
9   A.   It says on number eight the IEP
10 team determines homebound is ▮▮▮▮ least
11 restrictive environment. The homebound
12 services shall be provided to ▮▮▮▮ at a
13 school or physical education -- or physical
14 education -- is that right?
15   Q.   School district facility.
16       HEARING OFFICER:   At a school or
17 school district --
18   A.   I'm sorry. I'm missing a page.
19 So I don't --
20       HEARING OFFICER:   Let's get you --
21 that copy might not have it all, but here
22 is the next page.
23       MR. CASSADY:   We probably need to

1 substitute that one, Your Honor. That's
2 the one that's marked.
3       HEARING OFFICER:   It is. And it's
4 just missing a page. It's missing the
5 second page.
6       MR. CASSADY:   Okay. This one is
7 correct. So if I may substitute.
8       HEARING OFFICER:   Yeah.
9 Absolutely. Put another 21 and I'll give
10 you that one back.
11       MR. CASSADY:   Yes, sir.
12       HEARING OFFICER:   Total number of
13 pages.
14   Q.   There's 21. If you would go back
15 to paragraph eight of Judge Cole's order.
16 And we were discussing the issue of the
17 parent, how the parent would deliver the
18 child to the school. That was what you had
19 mentioned. So if you would, look at
20 paragraph eight.
21   A.   I was on the second page under --
22   Q.   Next page.
23   A.   Transportation as a related

27 (Pages 491 - 494)

Page 495

1  service shall be provided by the LEA
2  pursuant to IDEA regulation.
3      Q.  If I may stop you there.
4      A.  Uh-huh.
5      Q.  So transportation as a related
6  service shall be provided by the local
7  education agency pursuant to IDEA
8  regulations, end quote?
9      A.  Uh-huh.
10     Q.  Now, do the IDEA regulations --
11 what does -- what is the transportation in
12 the IEP that put him back at home,
13 homebound at home?  And that would be the
14 August 27, 2018 IEP.  What does it say
15 about transportation being provided?  And
16 if you'll give us the document number,
17 please.
18     A.  You said August 27?
19     Q.  Yes.
20     A.  Okay.
21     Q.  What does it say about
22 transportation in the August 27, 2018 IEP?
23     A.  Does the student require

Page 496

1  transportation as a related service?  Yes.
2  If yes checked, any transportation needs.
3  Adult support, preferential seating,
4  behavior intervention plan, restraint
5  system.  And specific type, safety vest.
6      Q.  So Judge Cole's order that
7  transportation as a related service shall
8  be provided by the LEA pursuant to the IDEA
9  regulations, in the August 27, 2018 IEP, it
10 says that the school is going to transport
11 him as a related service?
12     A.  It says it's a related service.
13 But under IDEA, if for some reason there's
14 a safety concern or the child cannot ride
15 the bus, I can reimburse the parent or
16 whoever she so chooses reimbursement for
17 transporting the child back and forth.
18     Q.  But I'm talking about what the
19 IEP says on August 27, 2018.
20     A.  But it's a related service.
21     Q.  And you're looking at that
22 document?
23     A.  Yes.

Page 497

1      Q.  What page is that, please?
2      A.  Seven twenty-six.
3      Q.  And it doesn't -- the IEP team
4  didn't write anything in that IEP on August
5  27, 2018 about reimbursement, did they?
6      A.  On August 27th on page seven
7  twenty-four, the homebound teachers will
8  provide services to the on -- on-campus
9  transportation will be provided to school.
10 Today we requested location in order to
11 provide transportation for homebound
12 services.  Mom was unable to provide
13 location or address at this time for
14 student to return home.
15     Q.  To return home at nine
16 thirty a.m., right?
17     A.  Yes.
18     Q.  Okay.  Because the bus had been
19 picking ████ up.  So they knew where to
20 pick him up at seven o'clock or six
21 forty-five, whatever time he gets on the
22 bus, right?  That IEP of August 27, 2018 is
23 referring to the mom declining to give an

Page 498

1  address where a bus can deliver him at nine
2  thirty in the morning at the end of his
3  morning at school, right?
4      A.  Yes.
5      Q.  Okay.  So how -- is -- all right.
6  Now, so you also said that -- and that was
7  because the mom said I'll be at work and
8  you can't leave him there at home.  And so
9  she refused to give you an address for a
10 bus to take him at nine thirty in the
11 morning, right?
12     A.  I don't know if she said that.
13     Q.  Now, you were at the meeting.  So
14 you have no recollection of what she said
15 about that?
16     A.  I do not know if that's what she
17 had.
18     Q.  She was at this meeting?
19     A.  But I don't know if that's
20 exactly what she said.
21     Q.  All right.  Now, so you say that
22 IDEA permits instead of -- that if
23 something -- if a judge orders that

28 (Pages 495 - 498)

Page 499

1 transportation as a related service shall
2 be provided by the local education agency
3 pursuant to IDEA regulations, end quote,
4 you believe that means --
5        MR. CASSADY: First of all, Your
6 Honor, did you find there's any ambiguity
7 in that language? Because if there is
8 ambiguity in that language to you, then it
9 means what it means. Transportation
10 service --
11        HEARING OFFICER: I see no
12 ambiguity in the language.
13        MR. CASSADY: Then I don't need to
14 ask about it.
15    Q.   Now, what does the -- the last
16 IEP was August 31, 2018, correct?
17    A.   Yes. Well, the last one that you
18 and I spoke of.
19    Q.   Well, is there one after that?
20    A.   I'll look and see.
21        MS. TATUM: There's more IEP's in
22 the white notebook.
23        THE WITNESS: In the white

Page 500

1 notebook.
2        MS. TATUM: One September 14.
3    Q.   Well, let's stick with the August
4 31, 2018 IEP.
5    A.   September 14th and September 28th
6 are also dates in the first book.
7    Q.   If we could, let's stick with the
8 August 31, 2018 IEP, please.
9    A.   Okay.
10    Q.   Are you at that document?
11    A.   Yes.
12    Q.   And would you turn to the special
13 education services page, please?
14    A.   Okay
15    Q.   So it says that the -- it says
16 under -- what does it say under
17 supplementary aides and services?
18    A.   Page seven eighty, ▓▓▓▓ requires
19 the assistance of an ASL interpreter for
20 academics in order to communicate with
21 others. She will assist during all
22 academic related services. This is as of
23 September 4th, 2018 to 5/22/2019. The

Page 501

1 amount of time, two hundred and forty
2 minutes. And it says weekly. Then weekly
3 again for sixty minutes September 4th
4 through 5/22. Location home. Allow
5 additional time for the completion of
6 assessments. A human reader will read
7 assessments to the student. Calculators
8 will be used.
9    Q.   And in this August 31, 2018 IEP,
10 the location of all of the services --
11 well, the location of services for explicit
12 instruction in reading and language arts
13 would be at home for forty-five minutes
14 weekly. Is that what that says?
15    A.   Yes.
16    Q.   Okay. And it says that he'll --
17 it will be provided by the homebound
18 teacher. And who was that?
19    A.   Susan Lambert.
20    Q.   And then it says that all the
21 services are going to be provided at home
22 except -- and I mean his home actually,
23 right? Except that it says he'll receive

Page 502

1 thirty minutes of daily living skills
2 instruction weekly. And that's going to be
3 the resource room, is that correct, or is
4 that -- what is -- which one is being --
5    A.   A homebound teacher to make
6 modifications and accommodations to
7 activities and assignments.
8    Q.   So --
9    A.   Is that the one?
10    Q.   So now this means that he's --
11 there's nothing -- on the August 31, 2018
12 IEP, that shows him receiving instruction
13 in any subjects at the actual physical
14 school location.
15    A.   Remember, I wasn't at that
16 meeting. So I don't know what they
17 decided. And it may not be communicated
18 here. But yeah.
19    Q.   Well, but an IEP is supposed to
20 indicate what services are being provided.
21 Do you agree with that?
22    A.   In the services, yes.
23    Q.   And it also says the location of

29 (Pages 499 - 502)

Page 503

1 services. And I'm asking you if you --
2     A.   What do I see? Home.
3     Q.   I'm asking you what the IEP says.
4 Where is services -- if he will receive any
5 academic services at the physical school
6 location in this May 30 -- in this August
7 31, 2018 IEP?
8     A.   It does not --
9     Q.   Okay.
10    A.   -- on the services page.
11    Q.   So in this August 31, 2018 IEP,
12 how many -- how much is he going to
13 actually come to school? Is he going to
14 come to school in this IEP?
15    A.   If we go back to page seven
16 sixty-eight for the August 31st meeting.
17    Q.   Okay. What is -- are these
18 minutes or is this something else you're
19 reading?
20    A.   This is the IEP.
21    Q.   May I see what you're looking at?
22    A.   Yes, sir. Seven sixty-eight
23 right here.

Page 504

1     Q.   Okay.
2     A.   That would be your second page.
3 So at the top of the second page of the
4 IEP, this was for the amendment date of
5 August 31st, 2018. It says, Original
6 homebound option was attempted. However,
7 on 8/30/2018 ▉▉▉▉ was not picked up at
8 nine thirty. Teacher assisted principal.
9 Special education director attempted to
10 contact mother at 8/30/2018 to inquire
11 about transportation. Parent did not
12 respond to messages or contact school.
13 ▉▉▉▉ behavior -- behaviors escalated
14 during and after lunch. Teacher and
15 assistant principal attempted to contact
16 parent and left messages on phone and at
17 work. Behavior continued to escalate. IEP
18 team considered options for ▉▉▉▉ and
19 agreed that homebound services at home
20 would be best option until behaviors are
21 better under control. BCBA will continue
22 to work with student and staff while
23 student receives homebound services. ▉▉▉▉

Page 505

1 will receive academic and speech services
2 at home. ASL interpreter will travel with
3 homebound teacher and SLP for homebound
4 services. And then it gives the schedule
5 or the --
6     Q.   So is your answer that as of
7 August 31, 2018 he was not going to be
8 permitted to come to a school facility at
9 all?
10    A.   Based on this, his services were
11 going to be at home.
12    Q.   Okay. Now, do you know, yes or
13 no, if the BCBA and the interpreter have
14 ever met at the same time with the student?
15    A.   The parent has not allowed us to
16 serve him at home for this to even take
17 place.
18    Q.   But I'm not talking about at
19 home. I'm talking about before.
20    A.   At school?
21    Q.   Yes.
22    A.   I don't know. I don't know.
23    Q.   And that's what I'm asking.

Page 506

1     A.   Yes. I don't know.
2     Q.   So it's clear for the record, as
3 far as you know as the special education
4 director, after Judge Cole's April 5, 2018
5 order, you have no knowledge the BCBA and
6 the interpreter ever met together with the
7 child at a school facility?
8     A.   I would not know the actual date
9 and time. Do I know that the BCBA and the
10 interpreter was there for him? Yes. There
11 was an interpreter for him.
12    Q.   That's not my question.
13    A.   No, I do not.
14    Q.   And I'm going to make it clear
15 for the record because I'm quite sure we'll
16 be needing this record. My question is
17 after Judge Cole's April 5, 2018 order, do
18 you know if the BCBA and the interpreter
19 hired by the district ever met with ▉▉▉▉
20 the three of them at the same time at a
21 school district facility? And if your
22 answer is no --
23    A.   I do not know.

30 (Pages 503 - 506)

1    Q.   Thank you.  Now, in this August
2  31, 2018 IEP which has been marked as
3  Exhibit 26, what does it say about
4  transportation in the IEP as a related
5  service?
6    A.   It says on page seven seventy --
7  I think that's the right one.
8    Q.   What's under the section
9  transportation, right?
10    A.   Uh-huh.  Give me one second.
11  Just making sure I have the right one.
12    Q.   Sure.
13    A.   Yes.  Okay.
14    Q.   And it says?
15    A.   Bus.
16    Q.   Bus for special needs?
17    A.   Uh-huh.
18    Q.   And if you would say yes.
19    A.   Yes.
20    Q.   And that's not, in fact, what the
21  IEP team decided on August 31, 2018, is it?
22  They did not decide he would have a bus for
23  special needs, or did they?  That's what

1  the IEP says.
2    A.   This says bus for special needs.
3  Once again, I wasn't there.  So I don't
4  know all the ins and outs.  But what I see
5  is bus for special needs is checked.
6    Q.   So according to the August 31,
7  2018 IEP, he was still to receive a bus for
8  special needs, right?
9    A.   Yes.
10    Q.   That's what it says?
11    A.   It does.
12    Q.   And he was to receive -- as of
13  August 31 at the conclusion of that IEP
14  meeting, the IEP team decided according to
15  this IEP of August 31, 2018 he would
16  receive a bus for special needs, that he
17  would get preferential seating.  He would
18  have adult support.  He would have a
19  behavioral intervention plan and he would
20  have a restraint system.  And then it says
21  the bus driver and support personnel are
22  aware of the student's behavioral and/or
23  medical concerns.  And then it says

1  underneath that ████ must be accompanied
2  by a paraprofessional or other staff
3  member.  Did I read the IEP correctly?
4    A.   You read it correctly.
5    Q.   And that has not been done after
6  August 31, 2018, has it?
7    A.   He was placed on homebound.  So
8  the plan for ████ was to have a
9  progression, a transition plan for him to
10  come back to school.  So he would need to
11  have bus in his plan because it was not our
12  intent for him to be at home the entire
13  time.  The BCBA was going to work with us
14  and with ████ in order to transition him
15  back for a full day.
16    Q.   Now, it had been a transition
17  plan in prior IEP's.  But I want to ask
18  you.  You understand that an IEP describes
19  the services to be provided so that the
20  parent knows what's going to be provided,
21  correct?
22    A.   Not just the parent.  But yes,
23  all.

1    Q.   And everyone?
2    A.   Everyone responsible for
3  implementation.
4    Q.   Are you saying that this
5  transportation description was accurate or
6  a mistake or just that somebody needs to
7  explain that it means?  Well, yeah.  We
8  said those things, but really we were
9  talking about a transition later.  Which
10  one is it?
11    A.   We had already spoken about a
12  transition.  In this IEP meeting that I was
13  not a part of it, the amendment stated that
14  the homebound option, the other option for
15  homebound had already been considered.  He
16  was now being placed home.  And like I
17  said, we have documentation.  We talked
18  about it before.  The goal was to have him
19  transition back to school for a full day
20  with the help of the BCBA.
21    Q.   Now, this IEP was not signed by
22  any of the members on August 31st, 2018,
23  was it?

31 (Pages 507 - 510)

Page 511

1    A.    What you have in front of you is
2 not signed. I'm sure there's --
3    Q.    You're sure there is a signed
4 copy?
5    A.    It should be a signature page.
6    Q.    And why should there be
7 signatures on the IEP?
8    A.    Attendance.
9    Q.    To prove they attended, right?
10   A.    Yes.
11   Q.    And so where is the one with the
12 signatures? Does yours have signatures?
13   A.    Did you have the page number?
14   Q.    My document signature page is
15 seven sixty-one. And that would be out of
16 the --
17   A.    This notebook. It does not have
18 the original signatures as they are typed
19 in. So it's not the original, but it has
20 the names of the participants of people
21 that attended.
22   Q.    But you said there would be a
23 signature page?

Page 512

1    A.    We sign one. Normally what
2 happens -- now, here I was not in
3 attendance at this meeting. But we sign
4 the signature page at the end of the
5 meeting. The names, of course, the
6 signatures won't go into the computer. You
7 have to type in who was there.
8    Q.    Well, in the previous IEP's you
9 stated that a draft is printed out and then
10 at the end of the meeting they sign it?
11   A.    Uh-huh.
12   Q.    With their pens, right?
13   A.    Correct.
14   Q.    Do you have -- yes or no, do you
15 know why there are no signatures on the
16 August 31, 2018 IEP?
17   A.    I do not know with the copy that
18 you've been provided why there are no
19 signatures.
20   Q.    Have you ever seen a copy that
21 did have signatures?
22   A.    I don't recall looking at the IEP
23 for August 31st because I was not in

Page 513

1 attendance.
2       HEARING OFFICER: Will you check
3 during the break?
4       THE WITNESS: Yes, sir. I can.
5    Q.    Signature page of August 31 IEP.
6 Now, would you turn in this August 31, 2018
7 IEP to the annual goal for language arts,
8 please?
9    A.    Can you give me the page number?
10   Q.    I have seven fifty-four at the
11 bottom of mine. And I'm going to read,
12 please, and tell me if this is accurate,
13 the measurable annual goal. Quote, █████
14 will develop a sequence of events using
15 written or illustrated steps provided.
16 Example, develop a personal schedule, task
17 list or directions for completing a task
18 using written or illustrated steps provided
19 with an accuracy of seventy percent or
20 greater by May 22, 2018, end quote. So
21 that's the same typographical error now
22 that we've seen in at least three IEP's,
23 true?

Page 514

1    A.    I'd have to go back and look.
2 But if it is, it's an oversight on our
3 part. 2018/19 IEP.
4    Q.    Sure. So you agree that this
5 measurable annual goal has a deadline date
6 that's already passed from when this IEP
7 was written.
8    A.    This is a current IEP. So we're
9 going to actually complete it by 2019. It
10 was an oversight.
11   Q.    But that's not so much my point
12 as to ask you this. If each IEP team
13 member has read this IEP at every IEP
14 meeting and participated as they're
15 required by law to do, why has no one
16 caught that mistake?
17   A.    I can't answer it. I don't know.
18   Q.    Thank you.
19   A.    Uh-huh.
20   Q.    Would you please tell us what the
21 next IEP date was?
22      MR. CASSADY: Judge, this is
23 Plaintiff's Exhibit 26. It's the August

32 (Pages 511 - 514)

Page 515

1 31, 2018 IEP.
2       HEARING OFFICER: Okay. Any
3 objection to Plaintiff's Exhibit Number 26?
4       MS. TATUM: Which is which IEP?
5       HEARING OFFICER: The IEP of
6 August 31.
7       MS. TATUM: Oh, no objection.
8       HEARING OFFICER: No objection
9 being made, Plaintiff's Exhibit Number 26
10 is admitted into evidence.
11      MS. TATUM: Is it a clean copy?
12      HEARING OFFICER: It's right here
13 on top.
14      MS. TATUM: No objection.
15      HEARING OFFICER: No objection
16 being made, Petitioner's Exhibit Number 26
17 is admitted into evidence.
18   Q.   And would you tell me, please,
19 the next IEP meeting that occurred?
20   A.   September the 14th, 2018.
21   Q.   And first, would you tell us who
22 signed this IEP?
23   A.   I don't have the original

Page 516

1 signature page, but I have the people that
2 were in attendance.
3   Q.   So, again, this is an IEP that's
4 not signed by any of the members who were
5 there, right?
6   A.   There may be a signature page.
7 I'll look for the original.
8   Q.   Could you tell us where you'll be
9 looking for the original signature page
10 since it was not in the student's file when
11 it was provided to your counsel?
12   A.   I will check with the school
13 teacher, the case manager.
14      HEARING OFFICER: The case
15 manager?
16      THE WITNESS: Yes, sir.
17   Q.   So is it the case manager that
18 has possession of the original IEP's?
19   A.   That's who normally keeps
20 original IEP's.
21   Q.   And what kind of file does she
22 keep that in?
23   A.   A folder that we have for our

Page 517

1 system.
2   Q.   And so when the IEP team members
3 sign an IEP, they put the date at the side
4 of their signature, don't they?
5   A.   We don't. Sometimes they just
6 sign. I don't know if they put the date.
7   Q.   Okay. All right.
8   A.   If the date is typed in there by
9 the name.
10   Q.   They don't ever back date them,
11 do they?
12   A.   No.
13   Q.   Okay. Thank you. Now, so this
14 IEP, let's start with the required by law
15 notice to Ms. ▓▓▓▓  Would you tell me
16 where that is, please? And we are
17 referring to --
18   A.   I think this meeting was actually
19 a resolution meeting. This was a
20 resolution meeting that we held on
21 September 14th.
22   Q.   September 14, 2018?
23   A.   Yes, sir.

Page 518

1   Q.   All right. And this is the
2 resolution meeting that in the second due
3 process hearing that was dismissed, it was
4 claimed by the school district that no
5 resolution meeting was held. Do you
6 remember that?
7   A.   I do not.
8   Q.   Okay. It was, and that was
9 attached as an order to the complaint in
10 this case. So a resolution meeting --
11      MS. TATUM: Objection, Mr. Hearing
12 Officer. He's mischaracterizing the due
13 process hearing. The school system's
14 position was that the parent would not
15 attend a resolution meeting, not that a
16 resolution meeting failed to be held.
17      HEARING OFFICER: Okay. So noted.
18      MR. CASSADY: And the position of
19 the student is in the record.
20   Q.   Now, where is the notice to
21 Ms. ▓▓▓▓ of this IEP meeting? There's a
22 -- first, do you agree with me that a
23 resolution meeting and an IEP meeting are

33 (Pages 515 - 518)

Page 519

1 two different things?
2   A.   Yes.
3   Q.   Okay.  Where is the notice to her
4 of this IEP meeting?
5   A.   Because it was a resolution
6 meeting, we had appropriate IEP team
7 membership.  And that would have been sent
8 to her counsel --
9   Q.   Okay.  Now --
10   A.   -- to notify her of the meeting
11 that we were having.
12   Q.   So you did not send the meeting
13 -- you did not send the notice to
14 Ms. ███
15   A.   You may have received it.
16   Q.   Did you send the notice to
17 Ms. ███
18   A.   I don't -- I would not have sent
19 one. I did not.  I did not send one to
20 her.
21   Q.   Has the school district ever,
22 ever that you can tell from your file
23 mailed a notice of an -- mailed by U.S.

Page 520

1 mail a notice of an IEP meeting to
2 Ms. ███
3   A.   I wouldn't be able to tell you.
4   Q.   If you know, has the school
5 district ever E-mailed an IEP meeting
6 notice to Ms. ███
7   A.   I wouldn't know.
8   Q.   If you would turn, please, to the
9 transportation page which is document
10 seventy-nine.
11   A.   Seven seventy-nine?
12   Q.   I'm sorry.  Seven seventy-nine.
13   A.   Okay.
14   Q.   Again, this one says for
15 transportation, bus for special needs,
16 adult support.
17   A.   My seven seventy-nine doesn't
18 indicate that, sir.
19   Q.   Seven seventy-seven.
20   A.   Seventy.  Okay.
21   Q.   And, again, the IEP says that
22 transportation will be, quote, a bus for
23 special needs, end quote, that there will

Page 521

1 be adult support, preferential seating,
2 behavioral intervention plan, restraint
3 system, safety vest and that bus driver and
4 support personnel are aware of the
5 student's behavioral and/or medical
6 concerns and that ███ must be accompanied
7 by a paraprofessional or other staff
8 member.  That's what this IEP says on dates
9 without signatures of September 14, 2018;
10 is that correct?
11   A.   Yes.
12   Q.   And, again, those were not
13 services that he was going to be provided
14 because he wasn't going to be coming to a
15 school facility under this IEP, was he?
16   A.   We didn't know what he was going
17 to have because we were waiting for
18 cooperation from the parent, for the BCBA
19 to work with him to know.  It could have
20 been a day.  It could have been two days
21 that she decided that we should transition.
22 We don't know the time.  But he would have
23 had transportation in place for him ready

Page 522

1 to receive him with support in place as it
2 indicates when the BCBA gave us indication
3 that we should start to transition him back
4 to school.
5   Q.   When does this IEP state that
6 these transportation services will
7 commence?
8   A.   It's readily here available for
9 the student.
10   Q.   When --
11   A.   It doesn't have a specific date,
12 but it's for the 2018/19 school year.
13   Q.   Now, if you would please turn to
14 the language arts page on document seven
15 seven eight.  And just please let me know
16 when you're there.
17   A.   Seven seventy-eight?
18   Q.   Yes, ma'am.
19   A.   Okay.
20   Q.   Do you agree the measurable
21 annual goal then says, quote, ███ will
22 develop a sequence of events using written
23 or illustrated steps provided.  And then it

34 (Pages 519 - 522)

Page 523

1   goes on and says that he will master this
2   goal and he'll achieve this by May 22,
3   2018?
4      A.   That's correct.
5      Q.   All right.
6      A.   Yes. But I want to say, also,
7   that throughout this IEP, that's the only
8   record that has that particular date on it.
9   The rest of them does say -- they do say
10  2019. So for that particular one that we
11  keep going back to, it says May 22, 2018.
12  But for the remainder of this IEP it's
13  2019.
14     Q.   And, again, so the people that --
15  there are no signatures but it indicates
16  that Mary Barnes, Tina Perry, yourself,
17  Celeste Welch and Paula Strong were
18  present. And, again, not one of them
19  caught this typographical error, right?
20     A.   We did not.
21     Q.   Thank you.
22     A.   Uh-huh.
23     Q.   And did you -- have -- did you

Page 524

1   read the IEP each time yourself?
2      A.   I'm sure we read it and it was an
3   oversight on our part that we didn't
4   correct that date for the current IEP.
5      Q.   Now, would you turn to document
6   seven eighty-three. Do you see where this
7   is a notice of proposal and refusal to take
8   action?
9      A.   Yes.
10     Q.   And do you see where it's checked
11  and it says LEA response to due process
12  hearing request?
13     A.   Yes.
14     Q.   And do you see where it says,
15  quote, The local education agency will take
16  the proposed action immediately without
17  undue delay?
18     A.   Where are you?
19     Q.   In the middle of it where it's
20  checked the local education agency will
21  take the proposed action immediately
22  without undue delay. Do you see that?
23        HEARING OFFICER: Mid page. It's

Page 525

1   blocked off.
2      A.   Okay. Yes.
3      Q.   And do you see where it's checked
4   provision of free and appropriate education
5   in the top box?
6      A.   I see the decision of specific
7   action proposal refused. Is that what
8   you're asking?
9         MR. CASSADY: May I approach?
10        HEARING OFFICER: Sure.
11     Q.   Do you see where that the notice
12  of proposal refusal to take action has
13  checked provision of a free and appropriate
14  public education?
15     A.   Yes.
16     Q.   That box is checked?
17     A.   Yes.
18     Q.   And it says this action will be
19  taken immediately without delay?
20     A.   Yes.
21     Q.   And that was signed by Tina
22  Perry?
23     A.   Where does it say immediately

Page 526

1   without delay?
2      Q.   It was the --
3      A.   Oh, right here. Will take
4   proposed action immediately. So whatever
5   we proposed.
6      Q.   Well, what this means is that
7   what the IEP team decided on September 14,
8   2018 regarding a free and appropriate
9   public education is that -- that action is
10  going to be taken immediately, right?
11     A.   It says the specific action
12  that's proposed or refused, whatever that
13  was indicated there.
14     Q.   It would be taken immediately,
15  right?
16     A.   Yes.
17     Q.   And an IEP team meeting was held
18  at the resolution meeting that day,
19  correct?
20     A.   It was a resolution meeting with
21  IEP team membership so that we could
22  discuss the items that were going to be
23  discussed.

35 (Pages 523 - 526)

Page 527

1    Q.    Was this an IEP meeting or not?
2    A.    This was a resolution meeting
3 with IEP team membership present.
4        MR. CASSADY: Judge --
5    Q.    The question, yes or no, is this.
6 Was an IEP meeting held on September 14,
7 2018?
8    A.    It was a resolution meeting.
9        HEARING OFFICER: Yes or no, and
10 then you can explain.
11    A.    Yes.  An IEP meeting that was a
12 resolution meeting in itself.  And that's
13 what's up here.
14    Q.    And is this an IEP that was
15 agreed upon by the -- well, not agreed upon
16 but that the team decided would be his free
17 and appropriate public education as of
18 September 14?
19    A.    Yes.  This right here.  Whatever
20 this is.  Yes.
21    Q.    Well, it needs to be clear for
22 the record.
23    A.    Uh-huh.

Page 528

1    Q.    And I'll mark it.
2        HEARING OFFICER: Number 27?
3        MR. CASSADY: 28, Your Honor.  And
4 this is the IEP dated September 14, 2018.
5 And that now I've marked this as 28, I'd
6 move to admit it.
7        HEARING OFFICER: Any objection?
8        MS. TATUM: So long as it's a
9 clean copy, I have no objection.
10        HEARING OFFICER: It's one that
11 doesn't have the blocks in it.
12        MR. CASSADY: It does not.
13        HEARING OFFICER: Okay.  No
14 objection being made, Petitioner's Exhibit
15 Number 28 is admitted.
16    Q.    So now that it's marked as -- may
17 I hand it to you?
18        MR. CASSADY: May I approach?
19        HEARING OFFICER: Yes.
20    Q.    Would you like your copy back?
21 After you've confirmed for yourself that
22 that is a -- the document, that that is the
23 IEP that the team wrote on September 14,

Page 529

1 2018.
2    A.    We didn't write this IEP.  This
3 IEP, the original IEP was written in the
4 spring and amendments were made to this
5 IEP.  So an amendment was made to this IEP
6 on September 4th, 2018.
7    Q.    Is that document in your hand --
8        MR. CASSADY: May I approach?
9    A.    Uh-huh.
10        HEARING OFFICER: Yes.
11    Q.    Is this document in your hand
12 which is Plaintiff's Exhibit 28, is that an
13 IEP for this student that was decided upon
14 by the IEP team on September 14, 2018?
15    A.    This is not an IEP that was
16 decided on by the team on September the
17 14th.  This was an amendment to the
18 original IEP that was written for this
19 student prior to this date.
20    Q.    Is the IEP that was in effect
21 after August 14, 2018 in your hands?
22        HEARING OFFICER: September.
23    Q.    September.  Yes.  Is this -- is

Page 530

1 this document in your hands -- may I see
2 it?
3    A.    Yes.
4    Q.    This document which is
5 Plaintiff's 28, do you agree that it says
6 individualized education Program?
7        HEARING OFFICER: If you want to
8 know what his IEP was on that date, would
9 it be that document?
10        THE WITNESS: Yes.  But we didn't
11 write that.
12        MR. CASSADY: That's what I was
13 about to ask.
14    Q.    And I want to follow up on what
15 you're saying about we didn't write it on
16 August 14, 2018.  Is it accurate to say as
17 far as you know as the special education
18 coordinator that the IEP's for -- this is
19 an IEP for August 7, 2018 through May 22,
20 2019, right?
21    A.    Yes.
22    Q.    And it's been amended many times
23 at this point, true?

36 (Pages 527 - 530)

1    A.   Yes.
2    Q.   And is it fair to say that the
3 only thing that has been amended is that
4 whenever he's had a behavioral episode,
5 there's been an indication of that in the
6 IEP as an amendment and then he becomes
7 increasingly homebound. Is that accurate
8 to describe the IEP's since Judge Cole's
9 order of April 5, 2018?
10   A.   That's your interpretation. Mine
11 would be that we looked at each situation
12 and called a meeting based on whatever the
13 situation may have been. But his behavior
14 prevented academics to go forward
15 effectively with him because his behavior
16 escalated. And I do know in the IEP's his
17 behaviors became even more severe and he
18 became more violent.
19   Q.   And the question, though, is --
20 well, first let me start with this one.
21 Judge Cole's order of April 5, 2018 was not
22 in the room when this IEP was established
23 either, was it?

1    A.   This was a new due process.
2 September 14 would have been a new one.
3    Q.   Yes, ma'am. And my question
4 is -- my question is this. Was Judge
5 Cole's order and judgment of April 5, 2018
6 in the room with this IEP team on September
7 14, 2018? Yes or no?
8    A.   I don't know. I don't remember.
9    Q.   Do you have a -- do you have a
10 specific or general recollection of it
11 being there?
12   A.   I do not.
13   Q.   Is it referenced anywhere in any
14 amendment written on this date of 9/14?
15 Does it anywhere say anything about Judge
16 Cole's order and judgment?
17   A.   Based on the amendment that was
18 made, that they had a copy?
19   Q.   On this day.
20   A.   On this day, September 14th,
21 2018. Just referencing number seven
22 sixty-nine, we would have had a copy
23 because it looks like we reviewed the

1 things that were -- some of the things that
2 were stated in the order.
3    Q.   All right. Now, read what it is,
4 please, into the record that you believe
5 indicate that Judge Cole's order and
6 judgment of April 5, 2018 was in the room
7 with the IEP team on September 14 --
8    A.   It was referenced. Whether or
9 not I had a physical copy --
10   Q.   I'm sorry. I apologize.
11       HEARING OFFICER: Let him finish.
12   Q.   I hadn't finished my question.
13 I'm not trying to be rude by interrupting
14 you.
15   A.   That's okay.
16   Q.   I'll back up.
17   A.   Go ahead.
18   Q.   I don't want to get too close to
19 you.
20   A.   We're all professionals. Come
21 on.
22   Q.   Now, would you read -- could you
23 give us the page number, please, at the

1 bottom, the Bates stamp number, if there is
2 one, and read into the record why you
3 believe Judge Cole's order and judgment was
4 in the room with the IEP team on September
5 14, 2018?
6    A.   I cannot say that it was in the
7 room, but it was referenced. Based on what
8 the amendment states, it references some of
9 the things that were stated in the
10 original order. So I will read those
11 things, but I cannot say today that I knew
12 that I had it. It looks like we did,
13 but --
14   Q.   You can't --
15   A.   It's been a long time. But we
16 had to have something to be this detailed
17 with our amendment. But I will share with
18 you -- if you want, I'll share with you
19 what I have.
20   Q.   May I ask this first?
21   A.   Yes.
22   Q.   Was counsel present with you?
23   A.   No.

37 (Pages 531 - 534)

Page 535

1   Q.   Okay.  Was counsel on the phone
2 with you?
3   A.   No.
4   Q.   All right.  With the IEP team?
5   A.   No.
6   Q.   Now --
7        MS. TATUM:  Wait.  She was
8 finishing his question and he interrupted
9 her.
10       HEARING OFFICER:  She said no.
11       MS. TATUM:  Explaining to him how
12 that mediation agreement was implemented at
13 that IEP meeting.
14       HEARING OFFICER:  Well, I think
15 he's asking her -- he said before you
16 answer that, I have a couple questions.
17       MS. TATUM:  I got you.  I just
18 wanted to make sure she could answer.
19   Q.   The question is would you read to
20 Judge Cole from the -- from the September
21 14, 2018 IEP amendment the language that
22 suggests to you that his order and judgment
23 of April 5, 2018 might have been there?

Page 536

1   A.   Page seven sixty-nine, September
2 14th, 2018, resolution meeting and IEP
3 meeting.  The parent failed to accept the
4 September 14th, 2018 resolution meeting.
5 Two resolution notices were sent to the
6 parent.  In addition, the IEP team reviewed
7 the assistive technology evaluation and
8 considered the recommendations.  That would
9 have been number ten in the order for an
10 assistive technology evaluation.  And it
11 resulted in the following.  ████████
12 assistive technology evaluation resulted in
13 the following recommendations.  One, that
14 the application to AIDB, or Alabama
15 Institute for Deaf and Blind, for summer
16 camp 2018.  Summer camp 2018, that would be
17 number eight in the order.  The summer of
18 2018.  And services for the 2018/19 school
19 year cannot -- cannot be confirmed due to
20 parent's failure to attend the meeting.
21 Sign language interpreter, which is number
22 two and three, to have a sign language
23 interpreter in place and classroom teacher

Page 537

1 to work together to determine appropriate
2 stories, textbooks that may be most
3 effective with ████████ Three, based on
4 ████████ interest and academic needs, books
5 can be uploaded to a tablet for ████████
6 Speech and language pathologist will
7 determine appropriate expressive
8 communication apps to use with ████████ We
9 will continue utilizing the Signing Times
10 program with ████████ In addition, he will
11 continue to have access to a sign language
12 interpreter throughout his instructional
13 day.  Again, that's two and three in the
14 order as well.  Data collection is
15 recommended to determine his progress.
16 This occurs each nine weeks of a grading
17 period and will continue upon ████████
18 return.
19   Q.   Thank you.  Where is -- where are
20 the minutes to that meeting?
21   A.   The minutes?
22   Q.   The minutes.
23   A.   Those are optional.  They may

Page 538

1 not --
2        HEARING OFFICER:  Do you know if
3 they took minutes?
4        THE WITNESS:  I do not remember.
5        HEARING OFFICER:  Okay.
6        MS. TATUM:  It's page seven
7 eighty-four, the minutes.  It's in the
8 white binder as well under Tab 17.
9   Q.   Okay.  Now --
10       THE WITNESS:  It's not in that.
11 Seven eighty-four?
12       HEARING OFFICER:  Tab seventeen in
13 white you said.
14       MS. TATUM:  It's in Respondent's
15 Exhibit 17.  And the Bates stamp is seven
16 eighty-four, seven eighty-five and seven
17 eighty-six.
18   Q.   So are you ready to proceed?
19   A.   Yes.
20       HEARING OFFICER:  She is.
21   A.   Yes.
22   Q.   Did you ever call the Alabama
23 School for the Deaf before this date and

38 (Pages 535 - 538)

Page 539

1  ask them if the applications had been made
2  by ▮▮▮
3     A.   No.  In the agreement the mom was
4  to send us copies.  And we have those.
5  That should be part of the records of
6  application she completed.
7     Q.   Did the mom send them to you?
8     A.   Yes.  Uh-huh.  Yes.
9     Q.   And did you notify her of any
10 deficiency in that application?
11    A.   I wouldn't know what the
12 deficiency would be because they were sent
13 to AIDB.  They would have contacted her for
14 that.
15    Q.   Now, the next exhibit is --
16       HEARING OFFICER:  29.
17    Q.   -- 29.  And these are the minutes
18 from -- without any additional markings
19 from the September 14, 2018 resolution
20 meeting.  First, do you know these are the
21 meeting minutes?  And these have the
22 attendees, right?
23    A.   Yes.

Page 540

1     Q.   Would you read who the attendees
2  are?
3     A.   Ms. Barnes.  I can't read the
4  first name because I don't have my glasses.
5  Mary Barnes.  Mary Barnes.
6     Q.   Okay.
7     A.   Mary Barnes, general ed teacher;
8  Celeste Welch, speech language pathologist;
9  Paula Strong, sign language interpreter;
10 Tina Perry, special education teacher;
11 Temeyra McElrath.
12    Q.   Okay.  And do you remember that
13 the assistive technology evaluation
14 recommended that there were some free
15 applications, free apps that ▮▮▮ might
16 use?
17    A.   Yes.
18    Q.   Okay.
19    A.   We had to go back to the AT eval
20 and see exactly what those are.  Would you
21 like to do that?
22    Q.   Well, there was no recommendation
23 by the AT, the assistive technology

Page 541

1  evaluation professional, that the school
2  spend even a dollar on anything for ▮▮▮
3  was there?
4     A.   I'd have to go back to the
5  evaluation.
6     Q.   If you don't mind.
7     A.   Okay.
8        MS. TATUM:  Do you need a page
9  number?
10       THE WITNESS:  Please.
11       MS. TATUM:  Six ninety-two.  No.
12 No.  I'm sorry.  Not six ninety-two.  Six
13 ninety-four.
14       MR. CASSADY:  I'll withdraw that
15 question unless someone objects to me
16 withdrawing it.
17       HEARING OFFICER:  Okay.
18         (Whereupon, Ms. ▮▮▮
19          entered the hearing room.)
20       MR. CASSADY:  Your Honor, could
21 the record reflect that Ms. ▮▮▮ has
22 arrived from work and she's present?
23       HEARING OFFICER:  So reflected.

Page 542

1     Q.   Would you please look at the IEP
2  -- and first could you tell us the next IEP
3  meeting would have been on December 30,
4  2018; is that accurate?
5     A.   No.
6     Q.   When was the next IEP meeting?
7     A.   September 28th.
8     Q.   And would you tell us who was
9  present at the September 28th, 2018 IEP
10 meeting?
11    A.   Ms. Perry, the special ed
12 teacher.  This has to be a mistake.  She's
13 not the general ed.  Ms. -- of course, I
14 was there, Temeyra McElrath.  Ms. Jackson,
15 principal.  Sean Kreauter, assistant
16 principal.
17       HEARING OFFICER:  Did we admit 29?
18 Did you have any objection, Ms. Tatum?
19       MS. TATUM:  Is that the September
20 14th IEP?  No objection.
21       HEARING OFFICER:  No objection
22 being made, Plaintiff's Exhibit Number 29
23 is admitted.  I want to make it clear for

39 (Pages 539 - 542)

1 the record.

2      MS. TATUM: Mr. Hearing Officer,
3 at some point can we give this witness a
4 break?

5      HEARING OFFICER: Sure. We're
6 near the lunch hour. Would this be a good
7 time to take lunch?

8      MR. CASSADY: Whatever the judge
9 wants.

10      HEARING OFFICER: Okay. It's --
11 let's be back at ten after one.

12      MR. CASSADY: Would you tell us
13 the document number of that?

14      HEARING OFFICER: The document
15 you're looking at?

16      MS. TATUM: Seven ninety-two.

17      THE WITNESS: Yes.

18      MR. CASSADY: Thank you.

19         (Lunch recess)

20      HEARING OFFICER: Okay. We'll go
21 back on the record and continue with
22 Mr. Cassady.

23      MR. CASSADY: Yes, sir.

1      Q.   We were looking at the IEP
2 that -- I'm sorry -- September 28th, 2018.

3      MR. CASSADY: Your Honor, first,
4 there was a question regarding exhibits
5 between my assistant, my paralegal and the
6 court reporter. Was that resolved?

7      COURT REPORTER: We're missing
8 Number 27. There's not a 27.

9      HEARING OFFICER: There's not a
10 27.

11      MS. TATUM: What is 27?

12      HEARING OFFICER: There isn't one.

13      MR. CASSADY: I'm sorry.

14      HEARING OFFICER: No problem.

15      Q.   Okay. Is the September 2018 --
16 September 14, 2018 IEP, that is an exhibit,
17 is it not? I believe it is.

18      HEARING OFFICER: Let's see. The
19 minutes, 29. But the IEP itself has not
20 been admitted, right?

21      MR. CASSADY: Okay. Thank you.

22      HEARING OFFICER: Is that correct?

23      MR. CASSADY: I believe it was 28.

1      HEARING OFFICER: All right. So
2 we do have 28. You're right. I think the
3 9/14 may have been 28.

4      MR. CASSADY: It is.

5      HEARING OFFICER: And we have not
6 done the 9/28 IEP yet, right?

7      MR. CASSADY: Right.

8      HEARING OFFICER: Wasn't there a
9 September 28th -- I mean December 28th?

10      MS. TATUM: There is a September
11 28th one as well, Your Honor.

12      Q.   Would you please pull out the
13 September 28 IEP, please?

14      A.   Yes.

15      MS. TATUM: I'm sorry. I should
16 be helping you. What number are you
17 looking for?

18      THE WITNESS: It's 28. You're
19 fine.

20      Q.   Okay. And who attended that IEP
21 meeting?

22      A.   Tina Perry, Temeyra McElrath,
23 Ayena Jackson and Sean Kreauter.

1      Q.   And our binder doesn't have a
2 copy of 28. May I see it?

3      MS. TATUM: Here. I've got one
4 for you.

5      MR. CASSADY: When was this filed?

6      MS. TATUM: When was it filed?

7      MR. CASSADY: Yeah. When was it
8 presented to the judge for the first time?

9      MS. TATUM: It's not filed. It's
10 just in the front of the notebook. I
11 haven't even put on a case yet.

12      MR. CASSADY: Understood. So
13 Exhibit 28 is being amended -- this is
14 amended in today?

15      MS. TATUM: No. I thought she was
16 reading. She was reading it and you said
17 you don't have a copy and I'm giving you a
18 copy. It wasn't in your book yesterday.

19      MR. CASSADY: I understand. Okay.

20      MS. TATUM: That's addition to
21 notebook. And I don't have a Tab 28, but
22 I'll try to bring one the next time.

23      Q.   So how did this -- we just went

40 (Pages 543 - 546)

Page 547

1 through the September 14, 2018 IEP. Now
2 there's another meeting on September the
3 28th --
4    A.   Yes.
5    Q.   -- of 2018. And what is the --
6 what is this -- how does this IEP change
7 the free and appropriate education being
8 provided to the child?
9    A.   This was a resolution meeting.
10 It says waited for arrival of the parent
11 and attorney and neither showed up. We
12 have records for --
13    Q.   Does it say that in the
14 individual education plan?
15    A.   The minutes.
16    Q.   Okay. If you don't mind, I'd
17 like to focus on the IEP first.
18    A.   Okay.
19    Q.   All right. So would you -- the
20 question was how did this IEP, the first --
21 let me make sure. Is this an IEP?
22    A.   This is an IEP.
23    Q.   Was it -- was it signed by the

Page 548

1 attending members on page eight 0 eight,
2 correct?
3    A.   Yes. Eight 0 eight.
4    Q.   And the interpreter isn't at this
5 IEP meeting; is that correct?
6    A.   Correct.
7    Q.   And the BCBA never went to any of
8 the IEP meetings; is that correct?
9    A.   I don't recall her being in any.
10    Q.   All right. And so how did this
11 IEP --
12       MR. CASSADY: And, Your Honor,
13 what's the missing exhibit? I'll just make
14 this --
15       HEARING OFFICER: 27.
16       MR. CASSADY: 27.
17    Q.   Okay. I've marked this as 27.
18 How, if you would please tell us, did this
19 September 28, 2018 IEP change the free and
20 appropriate education being provided to
21 ████████
22    A.   The only amendment that was made
23 to the IEP itself is that it indicated that

Page 549

1 on September 28th we had a resolution
2 meeting.
3    Q.   Okay. So this was while the
4 second due process hearing was pending that
5 was dismissed by the judge, correct?
6    A.   I don't -- I don't know.
7    Q.   So would you tell me the page
8 number where the only change in the IEP
9 occurred from the 9/14/2018 IEP to this
10 9/28/2018 IEP?
11    A.   The amendment that was made is
12 indicated on seven ninety-four. It says
13 September the 28th, 2018 resolution
14 meeting.
15    Q.   Okay. And that's -- that is all
16 that changed was to state in the IEP a
17 resolution meeting change?
18    A.   I'd have to read the minutes to
19 see if anything else was discussed for any
20 changes. I wouldn't know.
21       MR. CASSADY: I move to admit 27,
22 Your Honor. No marks on it. It's just the
23 document.

Page 550

1       HEARING OFFICER: Any objection?
2       MS. TATUM: No objection.
3       HEARING OFFICER: No objection
4 being made, Petitioner's Exhibit Number 27
5 is admitted into evidence.
6       MR. CASSADY: So the minutes which
7 I guess now would be 29, Your Honor, the
8 next exhibit, 29?
9       HEARING OFFICER: Yes.
10    Q.   We'll mark the minutes for the
11 September 28th, 2018 meeting. And do you
12 have those before you? It's document eight
13 eleven.
14    A.   Yes.
15    Q.   And would you read the first
16 sentence of the second paragraph under
17 discussion?
18    A.   Starting with we would like? Is
19 that what you want?
20    Q.   Yes.
21    A.   Okay. We would like to discuss a
22 communication system that would improve
23 communication from the parent to the school

41 (Pages 547 - 550)

· Page 551

1 system. We have a need for the parent to
2 respond to all communication, parenthesis,
3 example, phone calls, text, letters, close
4 parenthesis, from the school and special
5 education department in a timely manner.
6 Would you like for me to continue?
7    Q.   Let's start there. With this
8 issue about improving the communication
9 system with the parent, in that effort,
10 have you or anyone else for the district
11 ever asked the parent for her E-mail
12 address?
13    A.   I have not.
14    Q.   Have you ever heard of anyone
15 asking her for an E-mail address?
16       MS. TATUM: Objection, Mr. Hearing
17 Officer. This was asked and answered
18 yesterday.
19       HEARING OFFICER: Sustained.
20    Q.   Her E-mail address is
21 ████████████████@gmail -- I'm
22 sorry. @ymail.com. And here's another
23 one.

Page 552

1    A.   Would you like for me to write
2 these down?
3    Q.   Well, I want to get them in the
4 record first.
5    A.   Oh, okay.
6    Q.   The other one is ████████
7 ████████
   ████████████████U-P.com. And I
9 believe that stands for general manager.
10       MS. TATUM: Mr. Cassady, can you
11 also E-mail those to me?
12       MR. CASSADY: Yes. And I would
13 have if you'd ever asked for them before.
14 And if you have asked for them before,
15 would you please tell me what E-mail date
16 that was and I'll --
17       MS. TATUM: I don't have a clue.
18 I'd have to look.
19       MR. CASSADY: Okay.
20    Q.   Now, you communicate with people
21 every day by E-mail, don't you?
22       MS. TATUM: Objection. Asked and
23 answered yesterday.

Page 553

1       HEARING OFFICER: Sustained.
2       MR. CASSADY: Withdrawn.
3    Q.   Now, let's go back to the first
4 paragraph. It says, We waited for the
5 arrival of the parent and the attorney and
6 neither showed up. We have the records for
7 ████   ████ to review. What records were
8 those?
9    A.   I don't know.
10    Q.   Did you know that we had
11 requested all records be E-mailed to us
12 before the resolution meeting?
13    A.   That would have gone through my
14 attorney.
15    Q.   So you didn't know that?
16    A.   That would have gone through my
17 attorney, your request. No. I'm just
18 saying your request would have gone through
19 my attorney.
20    Q.   Are you aware that the
21 Administrative Code for Alabama provides
22 that the parents are entitled to access to
23 the education -- the educational records of

Page 554

1 the student before the resolution meeting?
2    A.   She has access. She's welcome to
3 come to my office at any time and review
4 those records. So I can give her access to
5 the records.
6    Q.   And so does that mean she could
7 go to your office today or Monday and
8 review those records?
9    A.   She has to give me notice that
10 she wants to have access, and I will give
11 her that access.
12    Q.   And what would be reasonable
13 advance notice to you?
14    A.   We'd have to look at the Code and
15 see. Does it say forty-five days? I'd
16 have to look. I do know that it's not just
17 spur of the moment.
18    Q.   Right. So -- but she's expected
19 to be at an IEP meeting the next day
20 sometimes, right? That's happened in this
21 case, true?
22    A.   Yes.
23    Q.   Okay.

42 (Pages 551 - 554)

1   A.   Not the next day.  Well, days
2 past.  It was the 24th and I think the
3 meeting was on the 27th.
4   Q.   Now, do you know what records for
5 ██████ ████ were being talked about in that
6 entry?
7   A.   I do not.  Not at this time.
8   Q.   Do you know if those records had
9 been provided before that date to ████
10 ████ in any way?
11   A.   I don't remember.
12   Q.   Now -- and it says paragraph two,
13 We would like to discuss the communication
14 system that will improve communication from
15 the parent to the school system.  We have a
16 need for the parent to respond to all
17 communication.  Example, phone calls, text
18 and letters.  It doesn't mention E-mails,
19 does it?
20   A.   It does not.
21   Q.   From the school and special
22 education department in a timely manner.
23 Now, is it your testimony that -- do you

1 know, is it your testimony that, for
2 instance, she refused to respond to E-mails
3 asking her -- text messages asking her to
4 come to the school?
5   A.   I wouldn't know.
6   Q.   Is it your testimony that she
7 refused to provide a location where the bus
8 could take ████ after school?
9   A.   I was never provided a location
10 when we made the changes to the IEP.
11   Q.   Have you asked the members of the
12 district who have been working on his IEP's
13 or working with ████ if any of them texted
14 asking for a location for him to be --
15 because that's in the IEP, right?
16   A.   I think there are some text
17 messages somewhere in the documentation.
18 I'd have to look and see what the content
19 is.  But I do know that for the short --
20 for the nine thirty as we indicated we
21 needed a location, I did personally talk to
22 transportation to set up bus transportation
23 for him to be dropped off after his time at

1 school.
2   Q.   And that's where we're talking
3 about the first refusal of her to provide
4 an address so that he could be taken home
5 at nine thirty in the morning after an hour
6 or so at school, right?
7   A.   I'd have to look and see and make
8 sure that's what you're saying.
9   Q.   Is that your recollection?
10   A.   I'd have to look and see.  But
11 according to an IEP, we did have one IEP
12 meeting that stated we were waiting on Mom
13 to give us a location.
14   Q.   For him to be returned to --
15   A.   Return home, yes.
16   Q.   Right.  At nine thirty in the
17 morning, right?
18   A.   Yes.  But we also have a website.
19 Mom is always welcome to E-mail me as well
20 to give me that E-mail address.
21   Q.   It doesn't have your E-mail
22 address on there, does it?
23   A.   On our website?

1   Q.   Yes.
2   A.   Yes.  You can actually E-mail me
3 through our Elmore County website.
4   Q.   Thank you.
5   A.   Uh-huh.
6   Q.   Now, the -- is it -- would it
7 surprise you that the first time she
8 received a text from a member of this
9 district asking her for an address that he
10 could be taken home, that she immediately
11 responded within an hour or two and gave an
12 address where her sister lived?
13   A.   I wouldn't know.
14   Q.   Okay.
15   A.   It wasn't a text to me.  So I
16 don't know.
17   Q.   No one told you about that text?
18   A.   I don't remember.
19   Q.   I'm saying do you -- is this a
20 surprise to you that if she texted back a
21 district -- when someone from the district
22 said we need an address to return ████
23 home from school, that she did respond that

43 (Pages 555 - 558)

Page 559

1 same day?
2    A.   I never received an address.
3    Q.   So that would have been the
4 obligation of the district employee to
5 provide you with that response by her,
6 right?
7    A.   If a bus was needed.
8    Q.   Okay.  Now, you guys were asking
9 for an address, right?
10   A.   Uh-huh.
11   Q.   If you would say yes.
12   A.   Yes.
13   Q.   Okay.  Now, was the school
14 district willing to take ███ to
15 Autaugaville?
16   A.   No, not out of the district.
17   Q.   Why not?
18   A.   Because we cannot provide
19 transportation outside of our district.
20   Q.   So if the only -- and where does
21 that -- who says that?  Who says that?
22   A.   I actually called the State
23 Department to confirm we cannot transport

Page 560

1 students outside the district.
2    Q.   And who did you speak with?
3    A.   I'd have to go back and just look
4 and see.
5    Q.   Is there someone there you call
6 on a regular basis?
7    A.   No.
8    Q.   All right.
9    A.   Because it's transportation.
10   Q.   Now, have you ever called
11 Ms. ███ yourself on the phone?
12   A.   I have.
13   Q.   Okay.  Have you ever spoken with
14 her on the phone?
15   A.   I don't know if I ever got an
16 answer, but I most recently called her in
17 January and left her a message.  She
18 actually called on one day, and I called
19 her back.  And I never heard back from her.
20 I left her a message.
21   Q.   You left her a message on her
22 phone?
23   A.   Yes.  Uh-huh.

Page 561

1    Q.   And so is that the only
2 conversation you can remember or the only
3 time you ever remember calling her?
4    A.   I don't remember me ever calling
5 before.  I could have very well.
6    Q.   And the reason I'm asking this --
7    A.   No, I didn't.  I tried to call
8 her the day that I arrived at Millbrook
9 Middle when -- was it August 30th I tried
10 to call her as well because she was not
11 answering the phone?  And so I tried to
12 call her that day, too.  I want to say it
13 was -- was it the 30th?  I'll look back and
14 see.  It would have been a time that I
15 tried to call her to -- yes.  The 30th.
16       MR. CASSADY:  While she's looking
17 at that, Plaintiff's Exhibit 29, the
18 minutes from this meeting with no markings
19 on it, we move to admit it.
20       COURT REPORTER:  We already have a
21 29.
22       HEARING OFFICER:  30.
23       MR. CASSADY:  30.  30 would be the

Page 562

1 meeting minutes from September 28.
2    Q.   Do you agree with me that it has
3 an incorrect date of 10/28?  I'm sorry.
4 These are the meeting minutes from the
5 September 28, 2018 meeting, but it has a
6 date on the minutes of October 28, 2018.  I
7 assume that is a typo.  Is that accurate?
8    A.   Let me look at that.
9    Q.   Let me hand it to you.  Is
10 that -- do you see the date up there?
11   A.   I do.
12   Q.   Okay.  And this was for the
13 September 28 meeting?
14   A.   Yes.  Uh-huh.
15   Q.   So is it true that for
16 Plaintiff's Exhibit 30, the date should be
17 September 28, 2018?
18   A.   Correct.
19   Q.   Not October 28, 2018?
20       HEARING OFFICER:  Any objection to
21 Petitioner's Exhibit Number 30?
22       MS. TATUM:  No objection.
23       HEARING OFFICER:  No objection

44 (Pages 559 - 562)

Page 563

1  being made, Petitioner's Exhibit 30 is
2  admitted into evidence.
3      Q. On page eight twelve at the very
4  bottom, it says meeting adjourned at eleven
5  fifteen on 9/28/18. So we can know that
6  that was indeed an error. Now, were you
7  ever advised in -- at any time -- did you
8  ever learn at any time that Judge Cole had
9  ordered in this case that if you folks were
10 going to ask Ms. ███████ to sign forms, that
11 they be provided to me first? Were you
12 aware of that?
13     A. Is that in --
14     Q. I'm just asking if you were aware
15 of it.
16     A. When we had to give all forms to
17 you?
18     Q. Let me get a straight question in
19 the record.
20     A. Okay.
21     Q. Were you ever aware let's say
22 within the last sixty days that this judge
23 had ordered in this case that if the

Page 564

1  district was going to ask Ms. ███████ to
2  sign forms, that they be provided to me
3  first?
4      A. Is that in the -- in writing?
5      Q. I'm asking if you were ever aware
6  of that?
7      A. I mean, I -- I don't remember
8  that being something that was in print.
9  But if you have it, I mean -- but we did --
10 but what we did was give it to our
11 attorney. Anything we sent to her was also
12 sent to our attorney. So we did not --
13 when we mailed to Ms. ███████ any requests
14 for records, you should have that on
15 record. And other than that -- so you
16 should have forms.
17     Q. So then the forms -- well, the
18 last resolution meeting was within the past
19 thirty days and an IEP meeting was held
20 again. Is that accurate?
21     A. What date are you referring to?
22 We had one on September 14th and one on
23 September 28th.

Page 565

1      Q. Right. And there has been one
2  since then, right?
3      HEARING OFFICER: For this case
4  you had a resolution meeting.
5      THE WITNESS: Yes. Uh-huh. We
6  did. I don't have that date. But yes.
7      Q. Let's just go ahead and get to
8  the December IEP which is Exhibit 31.
9  Could you tell us how his -- the provision
10 of special -- how this IEP changed in any
11 way from the September 28, 2018 IEP to the
12 December 13, 2018 IEP?
13     MS. TATUM: Ms. McElrath, it's in
14 the white notebook as Respondent's Exhibit
15 22.
16     Q. I believe that you would be
17 looking at the amendment, December 13,
18 2018.
19     A. Yes. Uh-huh.
20     Q. All right. It says that the IEP
21 team met to review ███████ recent
22 neuropsychological evaluation completed at
23 Elmore County's request. That's the first

Page 566

1  sentence, right?
2      A. Yes.
3      Q. And the district requested that
4  Ms. ███████ take her son to Birmingham to
5  see a neuropsychologist. Do you know that?
6      A. Yes. I made the appointment.
7      Q. Did Ms. ███████ take her son to
8  Birmingham to the appointment?
9      A. She did not make me aware that
10 she was going to, but she showed up on the
11 day of without notification to our system
12 at all that she was going to take him.
13     Q. Did --
14     A. So yes. She did take him.
15     Q. Did the -- is the district
16 willing to compensate her financially for
17 missing work and for doing these types of
18 things and pay her mileage for these
19 things?
20     A. We will pay her mileage to take
21 him to evaluation and back.
22     Q. Did you send her a mileage check?
23     A. She didn't submit a request for

45 (Pages 563 - 566)

1 reimbursement.
2    Q.   Did you give one to your attorney
3 to send to us?
4    A.   I don't remember everything that
5 was in the packet. But even now I'll
6 reimburse her. That's not a problem for
7 her trip there and back.
8    Q.   And her brother was called to the
9 school and y'all told him you'd pay him
10 mileage, too?
11    A.   If that was told to him and he
12 needs to be reimbursed, that's not a
13 problem.
14    Q.   Well, so -- and what rate does
15 the school system pay for mileage?
16    A.   I believe it's point five four
17 eight a mile.
18    Q.   Is it the federal rate?
19    A.   I don't know. That's just what's
20 in our policy. So I don't know.
21    Q.   And is that -- now, the -- do you
22 know what her brother does for a living?
23    A.   I do not.

1    Q.   Would it surprise you to know
2 he's a truck driver?
3    A.   It's not a surprise. I mean,
4 people have different professions --
5    Q.   Now --
6    A.   -- and careers.
7    Q.   It says in the next sentence,
8 quote, Certified letters, phone calls and
9 texts were sent to invite Ms. ███ to the
10 meeting. Ms. ███ contacted
11 special education teacher on December 13th,
12 2018 to request a telephone conference.
13 Ms. ███ was called by the special
14 education teacher and participated by phone
15 conference. The IEP team was introduced.
16 The special education director reviewed
17 Dr. Ackerson's neuropsychological
18 evaluation with the IEP team.
19 Recommendations were read per the
20 neuropsychological report including
21 recommendations for a mental health team,
22 significant behavioral concerns, academics,
23 additional services and a healthy lifestyle

1 for ███   Additionally, recommendations
2 for academics and cognitive remediation
3 were reviewed from the report including
4 modifications to ███ individualized
5 education program, individualized
6 techniques and ███ understanding of
7 directions and commands related to his
8 adaptive skills. What is ███
9 understanding of directions and commands
10 related to his adaptive skills?
11    A.   That would be a teacher that
12 would be able to tell you what his
13 understanding of those is.
14    Q.   Do you know as you sit here
15 today?
16    A.   I do not.
17    Q.   And it says, Ms. ███ stated
18 that ███ was previously seen at Laurel
19 Oaks Behavioral Health Center.
20 Furthermore, she stated that they did not
21 make educational recommendations.
22 Ms. ███ reports that ███ is currently
23 seeing a psychiatrist. I'll stop there for

1 a moment. Do you understand ███ has been
2 seeing a psychiatrist for years, right?
3    A.   I did not -- I did not know.
4    Q.   You did not know that?
5    A.   I didn't even know he was at
6 Laurel Oaks. Mom did not disclose that
7 information until that day. So I didn't
8 know he had been at Laurel Oaks.
9    Q.   So then it says when asked how
10 often, she indicated she has been seen
11 one time -- he was being seen one time per
12 month, a month. The team requested that
13 they receive any psychiatric reports in
14 order to coordinate recommendations from
15 ███ current psychiatrist. Now, the
16 next thing, it says the IEP team discussed
17 the current recommendation of homebound
18 services for ███   Ms. ███ stated that
19 ███ is currently out of district during
20 the school day staying with family. The
21 IEP team discussed the need for homebound
22 services. I'm going to stop there for a
23 minute. Ms. ███ has told the district

46 (Pages 567 - 570)